ILLINOIS CENT. R. CO. v. RECONSTRUCTION FINANCE CORPORATION.

No. 842.

District Court, W. D. Kentucky, at Louisville.

Oct. 2, 1946.

Judgment for defendant.

Doolan, Helm, Stites & Wood, of Louisville, Ky., for plaintiff.

Grafton & Grafton, of Louisville, Ky., for defendant.

SHELBOURNE, District Judge.

In 1943, the Defense Plant Corporation authorized Reynolds Metals Company to procure a site near Memphis, Tennessee, and cause to be built, equip and to operate thereon, an aluminum extrusion plant.

The selection of the site and construction of the plant were in charge of I. P. Macauley, Vice-president of Reynolds. Mr. Anderson Pace, General Industrial Agent of the Illinois Central Railroad System, received information that the extrusion plant was to be built in the vicinity of Memphis and arranged to attend a meeting there, at which officials of that City and Shelby County, Mr. Pace and Mr. J. R. MacLeod, District Traffic Manager of the Railroad Company, met Mr. Macauley. The purpose of the meeting, so far as Pace and MacLeod were interested, was mainly, if not solely, to secure the location of the new industry on or near the tracks of the Illinois Central.

A location adjoining the tracks of the Illinois Central approximately two miles south of Memphis, known as Raines Station, was secured and immediately the work of building the plant was begun.

The Railroad Company's main line at Raines consisted of a single track main line and a passing track east of the main track which extended for a distance of approximately 1600 feet. A small pagoda type station building was located on the west side of the main line.

Because of the topography of the terrain adjacent to the passing track on the east side of the railroad, there was room to load or unload cars on the passing track only for a total length of approximately

three freight cars. For this reason and because of the inconvenience in using the existing passing track on the opposite side of the main line from the plant, Mr. Macauley desired to have the switching facilities constructed on the west side of the main line, both for the use of the extrusion plant when completed and for the contractor—at that time not yet employed —while building the extrusion plant.

In order that the track to be built on the west side would be sufficiently long to serve adequately the contractor in moving its equipment and supplies and also the needs of the extrusion plant, when completed, the railroad company built a passing track of about 1600 feet in length on the west side of its main line with a "turn out" switch so as to enable cars to be switched from the main line onto the passing or industrial track and into the plant area.

The track was built about October, and was used by the contractor to bring to the plant site its equipment. When foundations for some of the proposed buildings had been completed, the Government cancelled the authorization for the plant and ordered all work on its construction to be abandoned.

The Railroad Company sent to Reynolds Metals Company an itemized statement in the amount of $6,922.27, which it claimed it had expended in providing the switching facilities and in salvaging the materials when it took up the switch following abandonment of the plant. Payment was recommended by Mr. Macauley, but the Defense Plant Corporation rejected his recommendation and refused payment. The Railroad Company filed this suit to recover the amount demanded from Defense Plant Corporation and Reynolds Metals Company.

By an order entered March 16, 1945, the action was dismissed without prejudice as to Reynolds Metals Company. An order was entered September 28, 1945, substituting the Reconstruction Finance Corporation for the defendant Defense Plant Corporation.

As permitted by Rule 8(e) (2) of the Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c, the plaintiff in its complaint set forth three separate claims:

1. An express contract.

2. A contract to be implied from the facts.

3. A quasi contract, implied by law.

The defendant denies the making or existence of an express contract and contends that the proven facts and circumstances are such that no contract can rightfully be implied in fact or by law.

By a stipulation filed, the letters evidencing the determination and intent of the War Department, the War Production Board and the Defense Plant Corporation to build the extrusion plant and designating Reynolds Metals Company to proceed with the project were placed in the record. Other than the letters, the evidence consists of the testimony of three witnesses, Anderson Pace, J. R. MacLeod for plaintiff and I. P. Macauley for defendant.

So much of the letter of intent as relates to the plant site is:

"You are further authorized to perform with your own forces or otherwise necessary engineering services and design work in connection with the preparation of the site and the construction of said plant at a cost not to exceed $1,000,000.00 provided such costs and any contracts in connection therewith shall be subject to the approval of the Chief Engineer or an Assistant Chief Engineer of this corporation or such persons as they may designate, and the approval of an authorized representative of your company."

Mr. Pace testifies that on the occasion of the first meeting in Memphis in July 1943, he made the statement in the presence of Mr. Macauley and others, that the responsibility for providing industry tracks rested upon the shoulders of the industry to be served. Mr. MacLeod says that he showed Mr. Macauley and others interested in setting up the plant, the existing tracks and discussed the transportation possibilities, including the needs during the period of construction; that he there stated to Mr. Macauley:

"That it should be understood that the tracks for an industry were paid for by the industry; that we would render any assistance that we could, and we knew from our past experience in the last couple of years, that we would probably be called upon to supply the rails for it and rail fastenings, etc., but it was understood by them that the industry was to pay for the tracks."

In January 1946, Mr. MacLeod testified by deposition and said:

"Q. You are saying, are you not, that there was no agreement made regarding the industry or any of the government agencies paying the railroad company for the *cost of that portion of the track along the right of way of the* railroad company? (Emphasis added) A. I don't know that there was."

In his letter to Reynolds of December 14, 1945, which accompanied the bill and demand for payment of $6,922,27, Mr. MacLeod stated:

"We did this work without requiring any purchase order because we thought when the track had served its purpose as a facility to be used in the construction of the plant, it would be available to us as a service track, and the turnout was necessary to serve further construction and normal operation of the plant."

Mr. Macauley admits discussing the transportation problems and possibilities with both Messrs. Pace and MacLeod and says that after he had studied the possibilities and requirements he told the railroad officials what the "demands would be," and that pursuant thereto the side or industrial track was built by the railroad company on the west side of the main line and extended to the boundary of the plant site with the "turn out"; that the industry with its own contractor proceeded to build the tracks within the plant area. The railroad company furnished certain of the materials and sent its bill for same which was paid. Mr. Macauley says that it was always his understanding that his company would pay only the cost of railroad facilities within the plant area and that the rail-

road company would install at its own expense the side track and facilities outside the plant area; that at no time did he agree otherwise and that he had no recollection of any proposition made or discussion had involving any other plan.

The Railroad Company does not attempt to show in the evidence by actual amount or estimate, the revenue it received after the siding was constructed nor does defendant undertake to show the amount paid to the railroad by its contractor and Reynolds Metals for transportation services.

In Kellum v. Browning's Adm'r., 231 Ky. 308 (315), 21 S.W.2d 459, 463, it is said:

"There is no difference in the legal effect of an express contract formally executed and of an inferred contract of this character, or, indeed, of a quasi contract. But there is a vast difference in the character and quantum of proof necessary to establish them. In establishing a contract by inference, the facts and circumstances must be sufficient to clearly and convincingly manifest or prove a mutual assent of minds to enter into the contract sought to be implied or established. * * * The term 'contract implied in law' is applied to a class of obligations created by law without regard to the assent of the parties upon whom the obligation is imposed—one which is not a contract obligation in the true sense, * * * as where one has received money or its equivalent under such circumstances that in equity and in good conscience he ought not retain it, in which case the owner may recover in an action in form ex contractu."

In the case of consensual contracts, the agreement defines the duty, while in the case of quasi contracts, the duty defines the contract.

The obligation created by law requires the recipient of benefits received to compensate the one bestowing them for whatever outlay he has made in bestowing them. Sullivan's Adm'r., v. Sullivan, 248 Ky. 744, 59 S.W.2d 999.

Actions to recover on quasi contracts are legal in form but "equitable to

82

the core." Herrmann v. Gleason, 6 Cir., 126 F.2d 936, 939.

■ In the Gleason case, the essential elements of a quasi contractual obligation upon which a recovery may be had are said to be the receipt of a benefit by a defendant ⁵from a plaintiff which benefit it is inequitable that the defendant retain. A quasi contract is not supported by any promise or upon the apparent intention of the parties to do or forbear doing a particular thing and is imposed in direct opposition to the intention of the party charged.

"Such contracts are the means which the law has adopted to raise up obligations in order to promote justice." Bailis v. Reconstruction Corporation, 3 Cir., 128 F.2d 857, 859.

■ It is not contended by the defendant here that the railroad was required by law to construct the side track on the west side of the track. In the absence of special contract, no such obligation existed. Hartford Insurance Co. v. Chicago, etc. R. Co., 175 U.S. 91, 20 S.Ct. 33, 44 L.Ed. 84; Santa Fe R. Co. v. Grant Bros., 228 U.S. 177, 33 S.Ct. 474, 57 L.Ed. 787; Greenwich Insurance Co. v. Louisville & N. R. Co., 112 Ky. 598, 66 S.W. 411, 67 S.W. 16, 56 L.R.A. 477, 99 Am.St.Rep. 313; Gorman Coal Co. v. Louisville & N. R. Co., 213 Ky. 551, 281 S.W. 487.

No law is referred to by plaintiff by which the railroad company was prevented from building the additional tracks, expecting to be compensated in the large revenues it would receive for transportation services when the plant had been completed.

The absence from the evidence of some writing evidencing or confirming the attempted agreement concerning the tracks is unusual considering the fact that representatives of the two parties were experienced and careful executives, each occupying responsible executive positions— and considering the further fact that the real party in interest on one side was a governmental agency spending public funds and circumscribed by well known principles of law of long standing, requiring written authority for or approval of the expenditures.

■ The proof is insufficient to show that there was an express contract.

■ Insistence by counsel that a contract should be inferred in fact is based upon the testimony of Messrs. Pace and MacLeod that they, each, stated to Mr. Macauley that any industrial track built would be at the expense of the industry and that Macauley's demands that the tracks be built after such previous statements support the conclusion that Macauley agreed to pay for the construction. The fallacy in this reasoning is that Messrs. Pace and MacLeod say that the term "industrial track" as used by them contemplated the track on the lands of the railroad company as well as that inside the plant area—while Mr. Macauley says that in the negotiations the term "industrial track" refers to the trackage constructed within the plant area. The inference is that, the parties having such divergent understanding as to the term "industrial track," there was no meeting of the minds.

■ There remains then the alleged quasi contract—the "equity to the core" phase of the case. The letter written by Mr. MacLeod to Reynolds Metals Company transmitting the statement for building the tracks presented as forcefully as does the evidence here the equitable angle.

But the cancellation of the contract occurred after the siding had been constructed and is not a circumstance to be considered in determining whether from the conduct and negotiations of the parties, the law will infer a contract.

Necessarily both parties knew that the existence of the plant would be ended by the successful progress, or certainly by the termination, of the War.

"Although there will be exceptions, in general the United States as a contractor must be treated as other contractors under analogous situations." United States v. Standard Rice Co., 323 U.S. 106, 65 S.Ct. 145, 147, 89 L.Ed. 104.

It is the failure on the part of Reynolds to complete the plant and utilize the tracks which furnishes the equitable reason for requiring the defendant to reimburse plaintiff for the cost of the track. That cir-

cumstance does not properly enter into the question of whether the law should imply a contract for the construction of the tracks.

The parties may prepare and submit proposed findings of fact and conclusions of law in conformity with the foregoing memorandum.