COOPERATIVE WAREHOUSE, INC., v. LUMBERTON TOBACCO BOARD
OF TRADE, INC.

(Filed 20 April, 1955.)

**1. Agriculture § 9—**

The business of operating warehouses for the public marketing of tobacco
is one affected with a public interest and is subject to reasonable public
regulation.

**2. Common Law—**

So much of the common law as has not been abrogated or repealed by
statute is in full force and effect in this State, G.S. 4-1.

**3. Agriculture § 11—**

Where the owner of a warehouse for the sale of leaf tobacco at public auction applies for membership in the board of trade, pays the required membership fees and is accepted as a member, *held*, the articles of association for the purposes expressed in the charter and by-laws of the board of trade constitute a contract between the board of trade and the warehouse member, and such member is deemed to have consented to all reasonable rules and regulations pertaining to the business which have been properly determined and promulgated.

**4. Agriculture § 9—**

Construing G.S. 106-465, as amended, *it is held* that the tobacco boards of trade in the several towns and cities in North Carolina in which auction markets for leaf tobacco are situated are given authority to make reasonable rules and regulations respecting the allotment of sales time among the owners of warehouses or groups of warehouses, and such delegation of authority is constitutional.

**5. Constitutional Law § 8c—**

While the General Assembly may not delegate the power to make law, it may delegate to an administrative commission or board authority to promulgate subordinate rules and regulations for the complete operation and enforcement of a law within its express general purpose, and to determine the existence of facts upon which the statute declares the law shall apply, so long as the General Assembly lays down the policy and prescribes the standards.

**6. Agriculture § 9—Regulations of the tobacco board of trade as to allotment of sales time held reasonable and valid.**

The findings of fact by the trial court were to the effect that the local tobacco board of trade was allotted a daily maximum amount of tobacco which could be sold by auction, that only about twenty per cent of the total warehouse space was actually needed for the auction of this quantity of tobacco, and that the board of trade allotted selling time to the owners of each warehouse or group of warehouses in accordance with the proportion which the floor space bore to the total warehouse space available, with further provision that the owner of more than one warehouse might transfer part or all of any selling time allotted to any one of his warehouses to other warehouses that he might own, and that the allotment of selling time should be based upon the total warehouse space owned, notwithstanding that part of the space might be used for storage of green tobacco and leased for other purposes with provision that the lessees should make the warehouses available for auction of tobacco, if required. *Held:* The regulations are reasonable and binding upon the membership, including a member who owns only one warehouse, the only difference between such owner and the owner of several warehouses being that his surplus space is under one roof.

**7. Appeal and Error § 29—**

Exceptions and assignments of error not discussed in the brief are deemed abandoned. Rule of Practice in the Supreme Court No. 28.

BARNHILL, C. J., and DEVIN, J., took no part in the consideration or decision of this case.

APPEAL by plaintiff from *Clifton L. Moore, J.*, at February-March Civil Term 1954 of ROBESON, to Fall Term 1954 of Supreme Court as No. 679, carried over to Spring Term 1955 as No. 665.

Civil action to have rules and practice of allotment of daily selling time upon the Lumberton Tobacco Market (1) declared null and void; (2) that defendant Lumberton Tobacco Board of Trade be declared affected with a public trust; (3) that it be required and enjoined to allot to plaintiff a fair and equal portion of the over-all selling time allotted to the Lumberton Market; (4) that it be restrained from counting in said apportionment any warehouse, or warehouse building, not intended to be actively used or presently actively used for the auction sale of leaf tobacco at said market; and (5) for such other and further relief as to the court may seem just and proper.

The cause coming on for hearing, and at the close of evidence the court, being of opinion that there is no issue of fact to be determined by the jury, dismissed the jury; and, having heard the testimony of witnesses for plaintiff and defendant, stipulations of counsel, documentary evidence and admissions in the pleadings, and, having personally viewed the tobacco warehouses involved in this action, by consent of plaintiff and defendant, the court finds therefrom the following facts:

"(1) The Bright Belt Tobacco Warehouse Association is a voluntary trade association, including in its membership practically all of the warehouses engaged in the auction sale of leaf tobacco in Georgia, Florida, North Carolina, South Carolina and Virginia; seventy-four markets, including the Lumberton market, are members of the association. The Association makes regulations controlling the sales of tobacco at auction on the several markets, that is, it fixes the opening and closing dates of the markets for auction sales of tobacco and determines the number of hours tobacco may be sold per day, the number of days per week, and the number of baskets that may be sold per day, on a given market. Non-member markets are governed by the same selling regulations as member markets. The Association was organized in April 1945 and has made regulations governing sales of tobacco, as above stated, since that date. 'The primary reason (for allotment of selling time on tobacco markets) is to keep the flow of tobacco, the total amount of tobacco sold, below the amount that the processing plants can redry. Tobacco is perishable . . . it is highly desirable and necessary that order be maintained in the process of sales. Sales should stop and start at uniform intervals, in order that growers may know when their tobacco will be sold . . .'

"(2) The defendant, Lumberton Tobacco Board of Trade, is a member of the Bright Belt Tobacco Warehouse Association and said Association makes regulations governing the auction sales of tobacco on the

Lumberton Market. The Lumberton Market is known as a 'Three-Set Market,' that is, for a major portion of its selling season it has three sets of buyers, and three separate auction sales can be and are conducted simultaneously on this market. For the 1953 season, the Association provided five and one-half (5½) hours selling time per day, five days per week, on the Lumberton Market, and allocated the maximum sale of 400 baskets per hour for each set of buyers on this market. The result was that under the regulations of the Association the Lumberton Market was permitted to sell daily 6,600 baskets of tobacco during the 1953 season. The same allocation of 6,600 baskets per day was made by the Association to the Lumberton Market each year from and after the organization of the association and the Lumberton Market had observed this selling limitation under prior regulatory agency each year from 1942 to the organization of the Association.

"(3) The defendant, Lumberton Tobacco Board of Trade, is a non-stock corporation, incorporated in 1942 under the provisions of Section 465, Chapter 106, of the General Statutes of North Carolina, and its members are warehousemen and purchasers of leaf tobacco at auction, of the Lumberton market. The defendant is authorized by statute 'To make reasonable rules and regulations for the economic and efficient handling of the sale of leaf tobacco at auction on the warehouse floors,' of Lumberton, but it is not authorized to make rules and regulations for 'The control of prices' or 'In restraint of trade.'

"(4) In the preamble to the Constitution and By-Laws of the defendant corporation, is the following: 'That the Lumberton Tobacco Board of Trade, Inc. has been organized and chartered in order that persons, firms and corporations engaged in the tobacco industry of Lumberton may become associated and prescribe such reasonable rules and regulations as experience has shown are necessary for the honest, orderly and economic conduct of the said business.'

"And Section VIII of said Constitution and By-Laws is as follows: 'Each member by the application of membership, and the acceptance of same, shall be deemed to have as fully consented and agreed to all of the terms and provisions of the by-laws, rules and regulations, as if he had duly entered into a written contract with the Lumberton Tobacco Board of Trade, embodying the same and containing his and its covenant to keep and perform the same.'

"(5) That for the selling season of 1942, and for each season thereafter, including 1953, the defendant has by regulation put into effect what is known as the 'Floor Space System' of allotting selling time among the member warehousemen of the Lumberton Market. The majority of tobacco markets use this system. Under this system the warehouseman is permitted to sell a certain number of baskets of tobacco

per day. The number of baskets allotted to him, in relation to the total number of baskets allotted to the entire Lumberton Market, is in the same ratio as the number of square feet of floor space in the warehouse or warehouses, owned, leased and controlled by him, bears to the total number of square feet of floor space in all of the warehouses on the Lumberton Market. For example, if he owns, leases and controls ten per cent of the warehouse floor space on the market, he received ten per cent of the total daily basket allotment for the market. Under this system, if a warehouseman (often a group of persons) owns, leases and controls a number of warehouses, he is permitted to sell his entire allotment in one warehouse, if it is large enough and he so elects; this is known in the trade as 'Transferring Selling Time.'

" 'From a warehouseman's standpoint (this) makes a difference in his overhead; same thing is true of purchasers of tobacco, if they have to go to sixteen warehouses per day as against six warehouses, why naturally (they) have more expense with labor and truck hire; from the grower's standpoint, he pays the bill for the whole operation, the cheaper (the) market process, (the) more he gets for his tobacco . . .'

"Under this system a warehouseman may put more baskets on his warehouse floor than is allotted to him for a given day (this excess is known as 'overage'). If another warehouseman, or other warehousemen, have for sale less baskets than allotted to them, then the warehouseman with an overage may sell his overage. This right is rotated, in order, among all the warehousemen, all having an equal chance to sell overage. The 'Floor Space System' is the prevailing custom in the industry.

"(6) In 1942 there was 402,125 square feet of warehouse floor space on the Lumberton Market, in ten warehouses, owned and controlled by five warehousemen (groups); and there were sales in only five warehouses. A basket of tobacco occupies only twenty square feet. 132,000 square feet of floor space (plus some small addition to prevent crowding and for convenience in handling, loading and unloading) would have been sufficient to sell the entire 6,600 baskets allotted to the Lumberton Market. Competition among warehousemen for larger percentage of the basket allotment, resulted in the construction of additional warehouses. In 1946 there were fourteen warehouses, owned or controlled by six warehousemen (groups) with 636,213 square feet of floor space (even though one warehouse was removed from the industry entirely and not considered in the allotments). In 1947 one warehouse was enlarged, making total floor space of 668,291 square feet on the market. In 1951 there were eighteen warehouses, owned or controlled by seven warehousemen (groups) with 872,275 square feet of floor space. In 1953 there were twenty warehouses, owned or controlled by eight warehouse-

men, with 1,363,628.97 square feet of floor space. All the while from 1942 to 1953 inclusive, the basket allotment for the Lumberton Market remained the same each year, 6,600, requiring only 132,000 to 200,000 square feet of floor space for actual auction sales. In 1953 there were regular sales in only eight warehouses.

"(7) From 1942 to 1953 inclusive, the greater part of the surplus floor space on the Lumberton market was used for storage of green tobacco (tobacco which had been sold but not redried) and redried tobacco in hogsheads. One warehouse was used for storage of cotton, a part of another for storage of lumber and building supplies, part of another for storage of tractors and automobiles, and parts of others for storage of miscellaneous items. Tobacco has never been sold at auction in some of the warehouses. Leases of the warehouses for storage, provide that the lessees will make the warehouses available for auction sale of tobacco, if required.

"(8) In the trade as a whole (not just in Lumberton), 'Not more than fifteen per cent to twenty per cent of floor space is needed for actual auction sale of the crop.'

"'Storage of green tobacco and hogshead tobacco is considered in the industry as essential to the efficient and economic handling of flue cured tobacco at auction. Without the means of adequately taking care of tobacco after it leaves the auction, your whole operation breaks down and it is just as necessary and as important part of the marketing process as the actual auction sale itself.'

"'Here there are two or three redrying plants' in Lumberton.

"'Experience in the industry shows that lack of storage space for green tobacco slows the selling process, causes farmers to keep tobacco on hand longer, resulting in deterioration of tobacco and decrease in its value.'

"Storage space is important for the Stabilization Corporation, which is the world's largest Farmers Cooperative. It administers a loan program, ninety per cent parity support guaranteed under Federal legislation to the growers. If tobacco does not bring a bid above support price, the Stabilization Corporation takes it, processes and stores it through the facilities of the industry until it can be resold. The profit is distributed to the growers. The Stabilization Corporation is not permitted to own warehouses for storage or redrying plants.

"(9) The defendant, Lumberton Tobacco Board of Trade, Inc., adopted a resolution on April 12, 1951 in part, as follows: '. . . It is expressly provided that the owner or operator of tobacco warehouses in the City of Lumberton shall have the right and privilege to transfer part or all of any selling time allotted to any warehouses, which he may operate to any other warehouses that he may own or operate.

" 'This resolution shall become operative and be binding upon the warehousemen operating warehouses in the City of Lumberton beginning with the tobacco selling season of 1951, and continuing each successive year thereafter and including tobacco selling season of 1956.'

"(10) That the plaintiff, Cooperative Warehouse, Inc., is a corporation, organized in January 1953, under the provisions of Article 19, Chapter 54, Sub-chapter V of the General Statutes of North Carolina, for the cooperative marketing of tobacco and other farm products; that it erected a tobacco warehouse just outside the city limits of Lumberton, and within 1,000 feet thereof, said warehouse being completed in July 1953, and contained 209,861.92 square feet of floor space; that in January 1953 plaintiff applied for membership in the Lumberton Tobacco Board of Trade, defendant, was accepted for membership and paid its fee, and received a copy of the by-laws in February 1953, and its Secretary in February 1953 discussed with an officer of the defendant the method of allotting selling time; that on July 14, 1953 the plaintiff wrote a letter to the defendant, in part, as follows: 'The Board of Directors of Cooperative Warehouse, Inc. advise that this warehouse was organized and constructed for the sale of leaf tobacco, and all of the selling time allotted or assigned to this warehouse will be used in this warehouse. The Directors further advise that the Lumberton Tobacco Board of Trade be requested by them that Cooperative Warehouse, Inc. and all other warehouses be allotted only that portion of the total sales time, assigned to the Lumberton Market, that will be used in the warehouse, claiming credit for the selling time or floor space for such allotment.'

"(11) That the plaintiff was represented by its secretary at a meeting of the Lumberton Tobacco Board of Trade on July 16, 1953, the plaintiff then being a member thereof; and at said meeting the above letter of plaintiff to defendant was read . . . 'It was received as information with no action Taken,' and at said meeting the following allotments were approved and adopted:

|  | Square Feet | Baskets |
|---|---|---|
| Carolina Group | 261,080.11 | 1264 |
| Hedgepeth Group | 155,186.91 | 751 |
| Star Group | 165,913.09 | 803 |
| Liberty Group | 261,080.12 | 1264 |
| Cooperative W'hse. | 209,861.92 | 1016 |
| Dixie Group | 118,517.91 | 573 |
| Smith Group | 124,336.91 | 602 |
| Britt Group | 67,652.00 | 327 |

"According to the 'Floor Space System,' plaintiff received its pro rata share. These allotments were approved by the members except the plaintiff. The representative of the plaintiff at the meeting objected to these allotments and informed the meeting that the plaintiff could not agree until there was a meeting of its directors, further stated he could find nothing in the by-laws as to how allotments were to be made, and was advised that allotments were adopted upon the recommendation of the Sales Committee each year before the market opened. Plaintiff's representative made no motion for change of method for allotting selling time.

"(12) That the plaintiff filed this action for injunctive relief on July 25, 1953.

"(13) All of the twenty tobacco warehouses on the Lumberton market are constructed in the way and manner of tobacco warehouses generally, in the industry, and all are fit and suitable for auction sale of leaf tobacco if goods in storage were removed."

Then there follow separate findings of fact, Numbers 14 to 32, both inclusive, in respect to the use to which each warehouse in the various groups listed in paragraph (11) above is devoted,—including the Co-operative Warehouse.

Then the court continued findings of fact as follows:

"(33) All of the twenty tobacco warehouses on the Lumberton market are available for auction sales of tobacco. It would not be economical to have twenty auction sales per day.

"(34) The plaintiff used approximately 82.5 per cent of the selling time allotted to it during the 1953 season, including overage sales. At times during the season, it could have sold more than its allotment.

"(35) The plaintiff constructed a warehouse with more floor space than it needed for auction sale of tobacco, in fact more than was needed to sell the entire allotment to the Lumberton Market; likewise, the other warehousemen had acquired much more floor space than was actually needed for the auction sale of tobacco. The only difference between the situation of the plaintiff and the situation of the other members of the defendant corporation is that the plaintiff's facilities are all under one roof."

Upon the foregoing findings of fact, the Court concludes as a matter of law:

"(a) That the allotment of selling time in accordance with 'Floor Space System' by the defendant is not and was not for the selling season, 1953, unreasonable, arbitrary or inequitable, but constitutes a reasonable regulation of selling time and a reasonable exercise of the authority conferred on the defendant by statute.

"(b) That the allotment of selling time in accordance with the 'Floor Space System' by the defendant is not and was not for the selling season 1953, a regulation in restraint of trade.

"(c) That the defendant's motion for judgment as of nonsuit at the close of all the evidence should be allowed."

Thereupon the court "Ordered, Adjudged and Decreed that the plaintiff's action be and the same is hereby dismissed, and that the injunctive relief sought by the plaintiff is hereby denied, and that the plaintiff pay the costs to be taxed by the Clerk."

Plaintiff (or petitioner) appeals therefrom to Supreme Court of North Carolina, and assigns error.

*F. D. Hackett and Robert Weinstein for plaintiff, appellant.*
*Varser, McIntyre & Henry for defendant, appellee.*

WINBORNE, J.  Appellant states this as the question presented on this appeal: "Did the court err in holding that the regulation brought into question was a reasonable exercise of the authority conferred upon the defendant by statute and that the same was not in restraint of trade?" Upon careful consideration of the subject this Court holds that the court did not so err.

In this connection, it is noted that the General Assembly of North Carolina in 1933 enacted a statute, P.L. 1933, Chapter 268, entitled "AN ACT TO AUTHORIZE TOBACCO BOARDS OF TRADE TO MAKE REASONABLE RULES AND REGULATIONS FOR THE SALE OF LEAF TOBACCO BY AUCTION."  This Act provides in pertinent part:

"Section 1.  That tobacco warehousemen and the purchasers of leaf tobacco, at auction, on warehouse floors, are hereby authorized to organize, either as non-stock corporations, or voluntary associations, Tobacco Boards of Trade in the several towns and cities in North Carolina in which leaf tobacco is sold on warehouse floors, at auction.

"Section 2.  Such Tobacco Boards of Trade as may now exist, or which may hereafter be organized are authorized to make reasonable rules and regulations for the economical and efficient handling of the sale of leaf tobacco at auction on the warehouse floors in the several towns and cities in North Carolina in which an auction market is situated.

"Section 3.  The Tobacco Boards of Trade in the several towns and cities in North Carolina are authorized to require as a condition to membership therein the applicants to pay a reasonable membership fee and the following schedule of maximum fees shall be deemed reasonable, to wit:  (Omitted because not pertinent to this appeal.)

"Section 4. Membership, in good standing, in a local Board of Trade shall be deemed a reasonable requirement by such Board of Trade as a condition to participating in the business of operating a tobacco warehouse or the purchase of tobacco at auction therein . . .

"Section 5. Nothing in this Act shall authorize the organization of any association having for its purpose the control of prices or the making of rules and regulations in restraint of trade.

"Section 6. This Act shall be in force from and after its ratification . . . 18th day of April A. D. 1933."

This statute was codified and became G.S. 106-465.

And the General Assembly, 1951 Session Laws of North Carolina, Chapter 383, by "An Act to Amend G.S. 106-465, provided for optional non-participating memberships in Tobacco Boards of Trade" by inserting after the paragraph reading: "Membership, in good standing . . .," provision that

"Membership in the several boards of trade may be divided into two categories:

"A. Warehousemen.

"B. Purchasers of leaf tobacco other than warehousemen."

"Purchasers of leaf tobacco may be: (1) Participating, or (2) Non-participating. The holder of a membership as a purchaser of leaf tobacco shall have the option of becoming, upon written notice to the Board of Trade, either a participating or a non-participating member. *Individuals, partnerships, and/or corporations who are members of Tobacco Boards of Trade, established under this Act or coming within the provisions of this Act, as non-participating members shall not participate in or have any voice or vote in the management, conduct, activities, allotment of sales time, and/or hours, fixing the dates of the opening or closing of tobacco auction markets, or in any other manner or respect."* (Emphasis ours.)

The Act of 1951 also provided that "All laws and clauses of laws in conflict with this Act are hereby repealed," and that the Act shall become effective upon ratification, which was done 27 March, 1951.

In this connection, even before the enactment of the above statute in 1933, this Court upheld the principle that the business of operating warehouses for the public marketing of tobacco is one affected with a public interest, and subject to reasonable public regulations. The Court so held in *Gray v. Warehouse* (1921), 181 N.C. 166, 106 S.E. 657.

In the *Gray case, supra, Clark, C. J.,* in writing the main opinion, quotes this principle: "The sale of tobacco at auction at tobacco warehouses is a business affected with a public interest, and those carrying it on are under the duties and obligations by common law to carry it on in a way that is reasonable and beneficial to the tobacco trade . . ."

And *Hoke, J.,* in a concurring opinion in the *Gray case, supra,* had this to say: "Subject to such reasonable rules and regulations as may be established by the public agencies, and when not interfering with same, the authorities in control and management of these warehouses have the power to establish for themselves such reasonable rules and regulations as may be required to promote business efficiency and insure fair and honest dealing in the transactions occurring there."

Here it may be noted that so much of the common law as has not been abrogated or repealed by statute is in full force and effect within this State. G.S. 4-1, formerly C.S. 970. See *Elliott v. Elliott,* 235 N.C. 153, 69 S.E. 2d 224, and cases there cited.

And since the enactment of the statute of 1933, the principle has been recognized in the light of the provisions of the statute. See *Warehouse Assn. v. Warehouse* (1949), 231 N.C. 142, 56 S.E. 2d 391, and *Board of Trade v. Tobacco Co.* (1952), 235 N.C. 737, 71 S.E. 2d 21.

Indeed, in *Warehouse Assn. v. Warehouse, supra, Devin, J.,* later *C. J.,* speaking for the Court and of the plaintiff there, Bright Belt Warehouse Association, Inc., declared: "From the pleadings herein summarized, it appears that the plaintiff is an association of tobacco warehousemen. Although incorporated without capital stock, and given legal entity with power to sue and be sued, it is nevertheless a voluntary association organized primarily for the benefit of those engaged in this business. While apparently there is no definite criterion or procedure for determining membership therein, it would seem that those engaged in the business who affiliate with the plaintiff, contribute to its support, attend its meetings, and receive whatever benefits are derived, may properly be regarded as members thereof."

And *Devin, J.,* continued: "It follows that the articles of association for the purposes expressed in the charter and by-laws of the plaintiff constitute a contract between plaintiff and its members which imposes certain obligation on the members among themselves and with respect to the association or corporation. Hence, as a consequence of membership in an incorporated association for mutual benefit, each member is deemed to have consented to all reasonable rules and regulations pertaining to the conduct of the business which have been properly determined and promulgated . . ."

In the light of the principle so declared in *Warehouse Assn. v. Warehouse, supra,* it is here appropriate to note that this action was instituted 25 July, 1953, and plaintiff alleges in its complaint that defendant is a corporation duly created, organized and existing with its principal office and place of business in the city of Lumberton, North Carolina, "the purpose of its creation being 'in order that persons, firms and corporations engaged in the tobacco industry of Lumberton may become

associated and prescribe such reasonable rules and regulations as experience has shown was necessary for the honest, orderly and economic conduct of said business,' and functions as the supervising authority in regulating the sale of leaf tobacco at auction on the Lumberton Tobacco Market, pursuant to the laws of the State of North Carolina and particularly Section 106-465, General Statutes of North Carolina."

Defendant, answering, admits that it is a corporation, created, organized and existing, with its principal office and place of business in the city of Lumberton, North Carolina, and that it is incorporated for the purposes declared in the Charter, and in General Statutes of North Carolina, Section 106-465, and it has such powers as are vested in it by the said statute and amendments thereto, as well as the powers conferred upon trade organizations at common law, and that it functions as the supervising authority in regulating the sale of leaf tobacco at auction, on the Lumberton Tobacco Market.

Therefore, it being admitted that plaintiff has applied for membership, and paid the required membership fees, and has been accepted as a member by defendant, Lumberton Tobacco Board of Trade, Inc., it follows, paraphrasing the language used in *Warehouse Assn. v. Warehouse, supra,* that the articles of association for the purposes expressed in the charter and by-laws of Lumberton Tobacco Board of Trade, Inc., constitute a contract between it and its members, including the present plaintiff, which imposes certain obligation on the members among themselves and with respect to the corporation. Hence as a consequence of membership in the corporation for mutual benefit, each member, including the present plaintiff, is deemed to have consented to all reasonable rules and regulations pertaining to the business which have been properly determined and promulgated.

Turning then to the provisions of the Act, Chapter 268 of P.L. 1933, it is seen that the General Assembly authorized Tobacco Boards of Trade, incorporated as therein provided, "to make reasonable rules and regulations for the economical and efficient handling of the sale of leaf tobacco at auction on the warehouse floors in the several towns and cities in North Carolina in which an auction market is situated." And it is seen further that by the amendment, 1951 Session Laws of North Carolina, Chapter 383, the General Assembly provided for dividing the membership into two categories. "A. Warehousemen. B. Purchasers of leaf tobacco other than warehousemen." And it is significant that the General Assembly declared that a holder of membership as a purchaser of leaf tobacco should have the option of being a participating or a non-participating member, and that a non-participating member "shall not participate in or have any voice or vote in the management, conduct, activities, *allotment of sales time, and/or hours,* fixing the

dates of the opening or closing of tobacco auction markets . . ." (Emphasis added.)   These provisions clearly indicate an intent that such matters come within the authority "to make reasonable rules and regulations . . ." granted by the General Assembly.   In this connection, the Court in *Motsinger v. Perryman,* 218 N.C. 15, 9 S.E. 2d 511, in opinion by *Barnhill, J.,* now *C. J.,* expressed the following principle: "The authority to make rules and regulations to carry out an express legislative purpose or to effect the operation and enforcement of a law is not an exclusively legislative power, but is rather administrative in its nature and may be delegated.   An administrative commission, within definite valid limits, may be authorized to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose.   So long as a policy is laid down and a standard is established by statute, no unconstitutional delegation of legislative power is involved in leaving to selected instrumentalities both the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply . . .   The authority granted is to 'fill in the details' in respect to procedural and administrative matters.   Such board may not adopt a rule under such delegated authority which has the effect of substantive law . . ."   To like effect are *Pue v. Hood, Comr. of Banks,* 222 N.C. 310, 22 S.E. 2d 896; *S. v. Curtis,* 230 N.C. 169, 52 S.E. 2d 364; *Coastal Highway v. Turnpike Authority,* 237 N.C. 52, 74 S.E. 2d 310; *Williamson v. Snow,* 239 N.C. 493, 80 S.E. 2d 262, and cases cited.

The 35th finding of fact seems to correctly portray the case; that is, "The plaintiff constructed a warehouse with more floor space than it needed for auction sale of tobacco, in fact, more than was needed to sell the entire allotment to the Lumberton Market; likewise, the other warehousemen had acquired much more floor space than was actually needed for the auction sale of tobacco.   The only difference between the situation of the plaintiff and the situation of the other members of the defendant corporation is that the plaintiff's facilities are all under one roof."

And while there are exceptions to certain findings of fact and assignments of error based thereon, yet in brief of appellant filed in this Court no argument is advanced in support of either, and hence are deemed abandoned.   Rule 28 of Rules of Practice in the Supreme Court, 221 N.C. 544, at page 562.

In the light of the findings of fact, the conclusions of law made by the trial court, on which judgment below is grounded, are proper.   The judgment in accordance therewith is

Affirmed.

BARNHILL, C. J., and DEVIN, J., took no part in the consideration or decision of this case.