FAYETTE TOBACCO WAREHOUSE COMPANY, Inc., et al., Appellants,

v.

LEXINGTON TOBACCO BOARD OF TRADE, a Corporation, et al., Appellees.

Court of Appeals of Kentucky.

Dec. 14, 1956.

As Modified on Denial of Rehearing

March 29, 1957.

Weldon Shouse, Lexington, Bradley & Bradley, Georgetown, for appellants.

Harbison, Kessinger, Lisle & Bush, Lexington, for appellees.

MONTGOMERY, Judge.

This appeal concerns the right of a tobacco board of trade to exercise reasonable regulations for the orderly sale of tobacco at warehouse auctions insofar as nonmembers of the board are concerned.

The burley tobacco loose-leaf market at Lexington, Kentucky, is the largest in the world. The Lexington Tobacco Board of Trade, hereinafter referred to as the Board, was organized in 1937 as a nonprofit corporation to supervise the tobacco sales in Lexington. Its purpose was to promote efficient and orderly sales for the benefit of its members, the farmers, and tobacco buyers.

There are 28 tobacco warehouses in Lexington. Of this number, 21 are members of the Board. Three nonmember warehouses are not participating in this controversy. The four remaining warehouses are owned and operated by appellants. Some of these warehouses were charter members of the Board, and all are former members.

The Tobacco Inspection Act, hereinafter referred to as the Act, was enacted by Congress in the public interest to provide for a uniform system of classification and inspection of tobacco to be sold at auction markets. 7 U.S.C.A. § 511a. Under the provisions of the Act, the Secretary of Agriculture has designated all burley tobacco auction markets, including Lexington, as markets where the sale of tobacco at auction constitutes a movement in interstate commerce. After such designation, no tobacco may be offered for sale at auction on such market until it has been inspected by an authorized representative of the Secretary. 7 U.S.C.A. § 511d.

In order to effectuate the purposes of the Act, the Secretary of Agriculture was authorized to cooperate with "purchasing and consuming organizations, boards of trade, chambers of commerce, or other associations of business men or trade organizations", as well as various political departments, agencies, or political subdivisions. 7 U.S.C.A. § 511m. Traditionally, the Secretary has cooperated with all local tobacco boards of trade with respect to the conduct of auction sales in states where burley tobacco is sold. Prior to such cooperation, the local plan of operation is examined from the standpoint of equitable treatment of all groups concerned to determine whether such plan would result in orderly marketing and effectuate the purposes of the Act. After such a determination has been made by the Secretary or his representative, official inspectors are made available to inspect the tobacco to be sold at auction under such system. The plan of operation of the Board was examined and found to be acceptable.

Five sets of inspectors, employees of the Federal Department of Agriculture, were used on the Lexington market. After the inspection, five sets of buyers representing the major tobacco buying interests attended the auctions and purchased the tobacco. Through the use of five sets of inspectors and buyers, five different auction sales of tobacco were permitted daily at the same time.

Prior to the opening of the market in 1946, the Board, with part of the appellants present, fixed the amount of floor space per basket at 6 ft. x 6 ft., or 6½ ft. x 5½ ft. The warehouses since 1947 have occupied a fixed position in rotation from 1 through 28 for the purpose of determining sale dates. Warehouses in positions 1 through 5 during the tobacco season of 1955–56 each received a set of inspectors and buyers on the first day of sale. Each set of buyers remained in the house to which it was assigned until that house was completely sold out of tobacco. Upon completion of that sale, the buyers assigned to the warehouse in position No. 1 went to warehouse in No. 6 position. The set of buyers in the warehouse in No. 2 position upon completion of that sale went to the house in No. 7 position, and on down the line of rotation until all of the warehouses had had a sale, and the rotation was then started over again. Representatives of appellants' four warehouses were present and participated in the selection of the system of rotation of sales adopted in 1947.

A directive issued by the Board on November 21, 1953, prohibited the sale of any tobacco in driveways below the regular floor levels which were normally used for farmer truck traffic or company drays. Appellants contend that their driveways were properly lighted and suitable for the conduct of sales. The Board also allotted the time for selling tobacco.

Appellants presented requests in 1947, 1948, 1949, and 1950 to the Board for permission to combine their warehouses in various ways in order to hold more advantageous sales. Part of these requests was allowed and the remainder denied. In 1951, appellants resigned from the Board but continued to abide by its regulations for the conduct of sales, including those controls now in controversy.

The principal differences between appellants and the Board arose over the regulations concerning the amount of floor space allowed per basket of tobacco, rotation of sales among the various warehouses, allotment of selling time, and the prohibition against selling in driveways. Appellants claim that these controls are a discrimination against them and that their enforcement has caused a loss of sales with resulting financial injury.

The differences between appellants and the Board resulted in three inconclusive legal skirmishes in 1953 and 1954; one in the Fayette Circuit Court and two in the United States District Court. The climax of their difficulties has been reached in this declaratory judgment action, filed November 30, 1954. It was brought by the appellants against the Board and its sales supervisor. The other warehouses in Lexington have been brought into the action by motion.

The right of the Board to exercise controls over appellants as nonmembers was submitted to the lower court on appellants' motion for summary judgment. It held that the Board could exercise such controls so long as it did not do so in a "discriminating, unreasonable, arbitrary or capricious manner".

Upon proof taken, the Chancellor held that the controls were reasonable. On appeal, only the right of the Board to exercise controls over nonmembers is concerned.

■ The board involved in this case is an association of warehouse organizations and persons engaged in the same general business, acting together for their mutual benefit. Its organization as a tobacco board of trade was not authorized by statute as in Cooperative Warehouse, Inc., v. Lumberton Tobacco Board of Trade, Inc., 242 N.C. 123, 87 S.E.2d 25, and Day v. Asheville Tobacco Board of Trade, 242 N.C. 136, 87 S.E.2d 18, wherein the board's right to regulate the allotment of selling time among its members was upheld.

The common law recognized such an organization as the Board, with the right to adopt reasonable rules for the governing of

its members and to enforce compliance with its regulations. Louisville Board of Fire Underwriters v. Johnson, 133 Ky. 797, 119 S.W. 153, 24 L.R.A.,N.S., 153; Stovall v. McCutchen, 107 Ky. 577, 54 S.W. 969, 47 L.R.A. 287; Cox v. Government Employees Insur. Co., 6 Cir., 126 F.2d 254.

■ The nature of the association seems to be the same, whether it be of common law or of statutory origin. The articles of association for the purposes expressed in the charter and bylaws constitute a contract between the organization and its members which imposes certain obligations on the members among themselves and with respect to the association, and as a consequence of membership in the organization for mutual benefit, each member is deemed to have consented to all reasonable rules and regulations pertaining to the business which have been properly determined and promulgated. Louisville Board of Fire Underwriters v. Johnson, 133 Ky. 797, 119 S.W. 153, 24 L.R.A.,N.S., 153; and Cooperative Warehouse, Inc., v. Lumberton Tobacco Board of Trade, Inc., 242 N.C. 123, 87 S.E.2d 25. See also 50 Am.Jur., Stock and Commodity Exchangers, Sections 1–4, pages 621–625. It is inherent that such organization is governed by the will of the majority or a greater segment of its members and that each member is bound by such a determination. Each member impliedly consents to be so bound by becoming a member and by accepting the benefits of membership.

■ In the instant case, so long as the appellants retained their membership in the Board, they were bound by the regulations of which they now complain. The controls were a part of the regulations necessary for the orderly operation of the tobacco auction sales. They were adopted by the Board for the mutual benefit of all members. It would appear that the Board could not discriminate against a nonmember in favor of a member in the enforcement of its controls. See American Federation of Tobacco Growers, Inc., v. Neal,

4 Cir., 183 F.2d 869, wherein it was held that a tobacco board of trade must allot selling time to a nonmember the same as to its members.

The maintenance of an orderly system of sales was the condition precedent to the approval by the Secretary of Agriculture under the Act which authorized the tobacco inspection, without which there would have been no sales by appellant or anyone else, either as members or nonmembers of the Board. The inspection service is one of the common benefits accruing to all members of the Board in return for their obligation to be bound by the regulations of the Board necessary to conduct an orderly market. The benefit carries with it a corresponding obligation to the members to obey the Board's regulations.

May a nonmember of the Board accept such a benefit and yet not be obligated to abide by the controls necessary to secure the benefit? This is a question of first impression with this Court.

■ The acceptance of the benefit of the Act by the appellants creates an obligation to abide by the controls, which is implied by law and is variously called an implied or quasi contract. A contract implied in law is perhaps a better term in order to distinguish it from a contract implied in fact. A right is created not by any promise or mutual assent of the parties but is imposed by law on the party irrespective of, and sometimes in violation of, his intention. See Williston on Contracts, Volume I, Section 3, page 6; 12 Am.Jur., Contracts, Section 6, page 502; Restatement of the Law of Contracts, Section 5, page 7; Gallant v. Waterman S.S. Corp., D.C., 90 F.Supp. 495. See also Illinois Cent. R. Co. v. R. F. C., D.C., 68 F.Supp. 78, affirmed 6 Cir., 177 F.2d 201, for distinction as to "consensual contracts".

■ In Clark v. People's Savings & Loan Ass'n of De Kalb County, 221 Ind. 168, 46 N.E.2d 681, 682, 144 A.L.R. 1495, 1497, a contract implied in law was defined

as "a legal fiction invented by the common-law courts in order to permit a recovery by the contractual remedy of assumpsit in cases where, in fact, there is no contract, but where the circumstances are such that under the law of natural and immutable justice there should be a recovery as though there had been a promise. Under such circumstances, common-law courts have supplied the fiction of the promise in order to permit the remedy."

For similar definitions of the term, see Thompson v. Hunter's Ex'r, Ky., 269 S.W.2d 266; Union Central Life Ins. Co. v. Glasscock, 270 Ky. 750, 110 S.W.2d 681, 114 A.L.R. 373; Kellum v. Browning's Adm'r, 231 Ky. 308, 21 S.W.2d 459.

The common law courts restricted the use of contracts implied in law to permit a recovery by an action of assumpsit. Usually, such cases were based upon unjust enrichment or benefit. This limitation as to form and basis of remedy seems too narrow, since a bill in equity or a libel in admiralty might be the appropriate means of enforcing some obligation implied in law. This would be especially so under CR 2, wherein the common law forms of action were abolished.

There are many cases where the law enforces in a contractual action a duty to restore the plaintiff to a former status—not merely to surrender the benefit which the defendant has received. It is said in Williston on Contracts, Volume I, Section 3, page 9:

" * * * As the law may impose any obligations that justice requires, the only limit in the last analysis to the category of quasi contracts is that the obligation in question more closely resembles those created by contract than those created by tort. * * * There are, however, unquestionably obligations imposed by law without reference to mutual assent and enforceable only in special assumpsit as if they were actual contracts. Accuracy of reasoning requires a recognition of such obligations also as quasi contracts."

In the present case, the nonmembers of the association question the right of the Board to enforce an obligation to obey its rules which were imposed to secure a benefit for members and nonmembers alike. The principle involved is the same, whether it arises by the nonmember questioning the right or by the Board seeking enforcement. There is no difference in principle in the present case, where the nonmember has accepted a benefit by which it has been unjustly enriched, from the usual case of unjust enrichment. The only difference is one of form, but in the last analysis, each benefit is financial. In such case, the Board has the right to enforce its controls upon members and nonmembers alike.

No merit is found in the contention of appellants that their state and federal constitutional rights have been violated.

Judgment affirmed.