B. B. ROGERS et al., Appellants,

v.

The DOUGLAS TOBACCO BOARD OF TRADE, Inc., et al., Appellees.

Charles B. HOLCOMB, Administrator, and Virginia H. Gambill, Administratrix, of the estate of Rady E. Holcomb, deceased, Appellants,

v.

B. B. ROGERS et al., Appellees.

No. 16284.

United States Court of Appeals Fifth Circuit.

May 9, 1957.

Norman M. Littell, Charles J. Alexander, Washington, D. C., John G. Kopp, J. Edwin Peavy, Waycross, Ga., for appellants Rogers and others.

George E. Maddox, Douglas, Ga., R. Glenn Key, Winston-Salem, N. C., Gibson & Maddox, Douglas, Ga., for appellants Holcomb and others.

E. Kontz Bennett, Waycross, Ga., Montgomery L. Preston, Douglas, Ga., Harold F. Baker, Washington, D. C., A. W. Gholson, Jr., Henderson, N. C., for Douglas Tobacco, and others.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

RIVES, Circuit Judge.

In an action for treble damages for alleged violations of the Sherman Anti-Trust Act,[1] the district court sustained the motions of the defendants to dismiss and for judgment on the pleadings, and this appeal ensued.

The basic facts as established by the pleadings, admissions and affidavits are

---

[1]. 15 U.S.C.A. § 1 et seq. In pertinent part §§ 1, 2, and 15 of said Act provide as follows:

"§ 1. *Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty*

"Every contract, combination · in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

"§ 2. *Monopolizing trade a misdemeanor; penalty*

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the serveral States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

"§ 15. *Suits by persons injured; amount of recovery*

"Any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages, by him sustained, and the cost of suit, including a reasonable attorney's fee."

substantially without dispute. We shall therefore heed Judge Sibley's wise admonition,[2] and go directly to the facts.

Beyond the control of the defendants, according to the present record, are many of the facts and circumstances from which it is claimed that the necessity arose for the allocation of selling time among tobacco warehouses in each of the local markets in the flue-cured area.[3]

2. "Under the Rules of Civil Procedure [28 U.S.C.A.] a case consists not in the pleadings, but the evidence, for which the pleadings furnish the basis. Cases are generally to be tried on the proofs rather than the pleadings." De Loach v. Crowley's, Inc., 5 Cir., 128 F.2d 378, 380.

3. Clearly and succinctly stated in the affidavit of Fred S. Royster, President of the Bright Belt Warehouse Association, Inc:

"It is necessary to allocate selling time among warehouses on each local market for the following reasons:

"Tobacco is a perishable commodity. It must be heat treated (referred to in the trade as redrying) within a short period of time after purchase and removal from the warehouse floors. The aggregate facilities of the tobacco buying companies and dealers for the redrying of producers' tobacco in the flue-cured area have a maximum capacity of about 120,-000,000 pounds weekly. The limit of this capacity is such that the volume of tobacco sold at auction in any one week must be regulated in order to prevent tobacco from deteriorating before it can be processed.

"Regulation of the flow of tobacco from producer to manufacturer on an overall basis within the flue-cured area is accomplished in the following manner:

"The flue-cured area is divided into 'belts.' In each belt there is in existence a Tobacco Warehouse Association operating in that belt, which is composed of all or most of the various warehouses. Membership by the individual warehouses is voluntary. Each of the five belt associations elect six of their members to serve on the Board of Governors of an organization known as the Bright Belt Warehouse Association. The Board of Governors of the Bright Belt Warehouse Association represent the vast majority of the entire tobacco warehouse industry in the flue-cured area comprising Virginia, North Carolina, South Carolina, Georgia, and Florida and, through a 'sales committee', performs the following functions:

"(1) The Board of Governors sets the date for the opening of the tobacco auction markets in each of the five belts, beginning with the extreme southern belt and moving northward through the five belts. The markets in the Georgia-Florida belt open around July 15 to July 25 and operate for approximately four or five weeks. The South Carolina and Border Belt opens approximately one week to two weeks after the Georgia-Florida Belt and remains open approximately seven weeks. The Eastern North Carolina Belt opens approximately two weeks after the opening of the South Carolina Border Belt. The Middle Belt opens one or two weeks after opening of the Eastern North Carolina Belt. The Old Belt follows, opening about two weeks after the Middle Belt.

"(2) The Sales Committee determines the number of hours per day during which all tobacco markets in each belt may operate. The maximum hours of operation for any market are 5-½ hours since this is the maximum working day for United States Department of Agriculture Graders and is the generally accepted work day throughout the industry. In the event the sales committee finds it necessary to reduce sales hours, the markets are given 48 hours notice.

"The sales committee does not distinguish between markets and allot more hours for sale to one market within the same belt than to another—all are alloted the same.

"(3) The Board of Governors determines the maximum number of baskets of tobacco which may be auctioned per hour per set of buyers. The maximum rate of speed is 400 piles per hour, or about 9 seconds per basket. This is the reasonable maximum speed for conduct of an auction sale and it is generally accepted in the industry as the best speed.

"The effect of the foregoing regulations promulgated by the Bright Belt Warehouse Association is that this association determines and controls the maximum amount of tobacco which may be sold in one day by each market. For example, one market has five sets of buyers. Since each set of buyers, under the regulations, can purchase a maximum of 400 baskets per hour, if the sales day is set at five hours, this means that one set of buyers in that market can purchase five times 400 baskets, or 2,000 baskets. Thus five sets of buyers can purchase five times 2,000 or 10,000 baskets per day. Since the sales committee of the Bright

The internal allocation of selling time among the warehouses on any local market is done by the tobacco board of trade of the particular city where the market is located. The defendants, as majority voting members of The Douglas Board of Trade, are responsible for the allocations of selling time among the warehouses on the Douglas, Georgia, tobacco market, and those allocations give rise to the present action.

The Douglas market has been in continuous existence since 1918. At the present time it includes seven tobacco warehouses, one of which is operated and controlled by the plaintiffs, and six by various parties named as defendants. Tobacco is brought by the farmer-growers to the warehouses where it is sold at auction by the basket or pile to buyers assigned to the market by the buying companies (see footnote 3, supra). Those companies have assigned to the Douglas market two sets of buyers, from which it follows that only two auction sales can be conducted simultaneously, and that the maximum amount of tobacco that can be sold on the Douglas market in any one day of the four or five weeks of the selling season is 4400 baskets. The opportunities of each of the seven tobacco warehouses to sell any part of this 4400 baskets is controlled by the local Board of Trade, which assigns to each of the warehouses a certain portion of each selling day during which sales can be held at that warehouse. The buyers attend only those sales held pursuant to the schedule of selling time issued by the Board. Eli-

Belt Warehouse Association knows the average weight per basket of tobacco, it can effectively control the total tonnage moving throught the markets by simply controlling the rate of sale and the hours of sale per day.

"In the final analysis the precise amount of tobacco which can be sold on any market in any one day is controlled by the number of sets of buyers on the market. The number of sets of buyers assigned to a market is determined exclusively by the buying companies and the Bright Belt Warehouse Association has nothing to do with the assignment of buyers to a market. Thus, if the buying companies choose to send another set of buyers to a particular market, that market would automatically be able to auction more tobacco per day.

"As hereinbefore stated, the maximum combined redrying capacity of the buying companies is approximately 120,000,000 pounds weekly. Thus, the reason that sales on the market must be geared to the overall redrying capacity is because there are redrying facilities on some markets and not on others and there is a cross movement of tobacco between markets for processing. In other words, for example, the American Tobacco Company may purchase tobacco on a particular market and ship it to some other locality for redrying. Of course, the Bright Belt Warehouse Association cannot tell a given buyer where to take his green tobacco for redrying nor on what markets to buy his tobacco.

"The sales committee of the Bright Belt Warehouse Association obtains a daily report from the United States Department of Agriculture of the total pounds sold on all markets on the preceding day and in this way the sales committee does keep a check on tonnage flow of tobacco to see that it does not exceed maximum processing capacity. Also, a particular buying company may notify the sales committee that their purchases have been so heavy that their redrying facilities cannot handle the tobacco and may request a curtailment of sales hours for a period of time. The sales committee, of course, gives serious consideration to such a request because it is to the interest of the farmers and the auction market system as a whole that buyers of a particular company not be withdrawn from the market because of an inability of that company to process its purchase. When in the considered judgment of the sales committee the public interest requires a temporary curtailment of the volume of tobacco flowing through the warehouses to the processing plants because of inability of the plants to redry the tobacco, it takes remedial action by either reducing sales hours or suspension of all sales until processing can catch up.

"The authority of the Bright Belt Warehouse Association derives from the consent of its membership and the farmers and industry generally. There is no statutory authority.

"The Bright Belt Warehouse Association takes no action with respect to the internal allocations of selling time among warehouses on any market."

gible for membership in the Board of Trade are the tobacco warehousemen, the buyers, and all persons operating on the tobacco market. The defendants comprise the majority of the participating or voting membership of The Douglas Board of Trade and, hence, control and direct the policies and practices of the Board.

For many years prior to the opening of the 1954 tobacco market season, it was the custom and practice of the Douglas Board of Trade to allocate selling time to each of the warehouses on the basis of the "Unit Floor-Space System." Each warehouse was credited with one unit for each 55,000 square feet of floor space. Five of the warehouses owned by various defendants were one-unit warehouses, and the sixth was a two-unit warehouse. Thus, prior to the construction of plaintiffs' warehouse, there were a total of seven units, the two-unit warehouse operated and controlled by one set of defendants, two of the one-unit warehouses by another set of defendants, and each of the three other one-unit warehouses by a separate set of defendants. There being a total of seven units of floor space in the six warehouses, the two-unit warehouse was allotted two-sevenths of the selling time, and each of the other warehouses one-seventh thereof. In May of 1954 the plaintiffs commenced the construction of a four-unit or 220,000 square foot warehouse in Douglas. If the "Unit Floor-Space System" of allocation had remained in effect, the plaintiffs, upon completion of their warehouse in time for the opening of the 1954 season on July 15, 1954, would have been entitled to considerably more than one-third of the total selling time available for the Douglas market.

As soon as the defendants learned of the plaintiffs' intention to construct a warehouse and throughout the period of construction differences arose, the defendants accusing the plaintiffs of trying to force them to buy the new warehouse rather than let the plaintiffs "hog" the market, and the plaintiffs accusing the defendants of trying to prevent them from engaging in the tobacco auction business on the Douglas market. The plaintiffs' warehouse, commonly known as the Big Independent 1, 2, 3, and 4, was completed by the end of June, 1954, at a cost of $200,000.00.

On July 10, 1954, about ten days after the completion of plaintiffs' warehouse and five days before the 1954 season opened, The Douglas Board of Trade adopted new by-laws to provide for the allocation of selling time as follows:

"Article III.

"Warehousemen.

"Section 1. Any warehouse desiring membership in the Douglas Tobacco Board of Trade, Inc., and desiring to sell tobacco as a member of said association shall be built within the city limits of Douglas, Georgia, or within a reasonable distance from said city limits and within Coffee County, Georgia. A tobacco warehouse shall be a building suitable for selling tobacco, with proper lighting, scales, trucks and other necessary fixtures and shall be easily accessible, both to farmers and to buyers.

"Section 2. It is further provided that a warehouse under this provision is any warehouse building under one continuous roof (not connected with any other roof), and over one continuous floor (not connected with any other floor), and provided further that no single warehouse building shall be divided for the purpose of being counted as two or more warehouses. After a warehouse is originally built, no alterations or changes can be made to such warehouse in order to make more than one original house. Any concern operating more than one warehouse may transfer sales from one warehouse to another as they see fit."

"Article IV.

"Section 1. Until a change of conditions shall warrant a change

in these By-Laws, and until there is such a change in these By-Laws, limited selling time available for the several auction warehouses on the Douglas Tobacco Market shall be divided among and allocated to the several warehouses doing business on the Douglas market at Douglas, Georgia, in accordance with the following rules, to-wit:

"A. If all of the warehouses on said market for any given year shall agree unanimously in writing upon the division of selling time among these warehouses then such unanimous agreement shall be recognized by the Douglas Tobacco Board of Trade and the selling time shall be allocated among the said warehouses in accordance with said unanimous agreement, which shall be signed by all warehousemen and the original filed with the secretary of the association and available to all interested parties.

"B. Inasmuch as 1954 season will be the first season after the formation of the Douglas Tobacco Board of Trade, Inc.,[4] the selling time for 1954 shall be allocated to each warehouseman in such proportion as the gross sales of tobacco in such warehouse were to the total gross sales on the Douglas, Georgia, tobacco market for the two years preceding the allocation provided, however, that after the 1954 season in arriving at gross sales no amount of tobacco sold in resale in excess of 10% of the total sales of gross sales of any warehouse will be considered. That is to say, after the 1954 season the allocation shall be in proportion to sales by each warehouseman to total sales, based on producers sales, plus 10% of resales of tobacco, provided further

"That the said selling time in each warehouse shall not vary more than 3½% from the allocated selling time for the preceding season.

"Provided further, however, that in the event of a new warehouse and/or a warehouse which did not operate on the Douglas, Georgia, tobacco market during the preceding season, claiming selling time, then the selling time allotted to such new warehouse or warehouse not operating the preceding season claiming selling time, shall be allotted on an average and in proportion with the amount of selling time available to all warehouses operating as a part of Douglas, Georgia, tobacco market; provided, further, if such new warehouse and/or warehouse which did not operate the preceding season is smaller in size than the average of all warehouses comprising the Douglas, Georgia, tobacco market, then the selling time shall be allotted according to the proportion of its size in relation to all other warehouses. Provided further that if said new warehouse or warehouses which did not operate the preceding season is larger in size than the average of all warehouses operating on the Douglas, Georgia, tobacco market, such warehouses or warehouse shall not receive any consideration in selling time for the size in excess of the average of all warehouses and shall in no event be allocated more than its equal pro-rata share of selling time as it is determined by the number of warehouses operating as hereinbefore set forth.

"C. The total remaining selling time allotted to the market after selling time has been allotted to a new warehouse and/or a warehouse which did not operate on the market during the preceding season shall be allotted to the remaining houses which did operate the preceding season in accordance with the

4. The Board of Trade had theretofore been an unincorporated association.

first paragraph of subsection B above."

The parties are agreed that under the "Unit Floor-Space System" theretofore in effect the plaintiffs would have received approximately 36.36 per cent of the available selling time or an opportunity to sell 1600 baskets of tobacco a day during the 1954 market season, while, under the "Modified Experience Basis" adopted by the new by-laws, they were actually allocated one-seventh, 14.28 per cent, of the available selling time, limiting them to the sale of 628 baskets of tobacco a day during the 1954 season. The farmer-growers brought to the plaintiffs' warehouse during the 1954 season more tobacco than could be sold within the allotted selling time.

The 1955 season opened on July 21, 1955, with the same maximum limitation on the total amount of tobacco that could be sold on the market in any one day—4400 baskets a day. The plaintiffs' allocation of selling time was increased from 14.28 to 14.77 per cent of the available selling time, or from a maximum of 628 to 650 baskets of tobacco a day. If the 3½ per cent (3½% of 14.28%) limitation had not been applied and the plaintiffs had been allocated selling time on the basis of their performance during the 1954 season, it is estimated that they would have received an allocation of selling time sufficient to sell 924 instead of 650 baskets of tobacco a day during the 1955 season.

The basic question for decision is whether, under the foregoing facts, the defendants were entitled to a judgment as a matter of law.

Considering first the earlier year, 1954, the defendants insist that some form of allocation of selling time among local tobacco warehouses was necessary and that the change from the "Unit Floor-Space System" to the "Modified Experience Basis" was reasonable.

All of the responsible parties are not before the court, and the issues are not so framed as to call for a review of the necessity for some form of allocation of selling time. That necessity arises for the reason set forth in the affidavit of Fred S. Royster (footnote 3, supra), for none of which is there any claim that the defendants are responsible. The tobacco buying companies and dealers can preserve and redry only so many pounds of tobacco per week. There is thus a natural limit to the amount of tobacco they can purchase. They choose to make such purchases by open competitive bidding at tobacco auction markets. Their right to make that choice has not been questioned. In all probability the auction method provides each farmer-grower with more competition for the purchase of his tobacco than he would otherwise have. The buying companies assign to each market the number of sets of buyers they see fit, and again no one has questioned their right so to do. Certainly none of the defendants can require them to assign a greater number of buyers. Automatically the number of sets of buyers determines the amount of tobacco which can be sold on any market in any one day. When the buying companies and the Bright Belt Warehouse Association have acted, the total selling time of each local market and the total amount of tobacco which can be sold on such market have become fixed. The tobacco auction market system is thus an organized and restricted rather than an uncontrolled and completely free arrangement. This action is not a frontal attack upon that entire system, but is restricted to one relatively small segment, namely, the internal allocations of selling time on the Douglas market.

Auction tobacco warehouses do much more for the farmer than simply storing and preserving his highly perishable tobacco. One of their chief functions is to obtain the best possible price for his tobacco. At an auction sale the "man in the hole" represents the warehouse, keeps the bidding lively so as to get the highest price possible, and in so doing often has a pile of tobacco "knocked down" or sold to the warehouse itself.

A farmer dissatisfied with the last bid has the privilege of rejecting all bids.

■ With two sets of buyers assigned to the Douglas market, and, hence, only two auction sales being conducted simultaneously, with a maximum working day of 5½ hours, and the market operating for only four or five weeks, and with the possibility of selling only 400 piles of tobacco per hour, it becomes obvious that for the tobacco auction market system to be workable at all, the limited total available selling time must be allocated among the warehouses upon some basis. That necessity has given rise to a custom adhered to generally throughout the flue-cured area by the buyers and by the warehouses alike by which the function of allocating selling time among the local warehouses devolves upon the local board of trade. In North Carolina that custom has been carried forward into a statute formally vesting such authority in the Tobacco Boards of Trade of the several towns and cities. North Carolina Public Laws 1933, Chapter 268. Georgia has no similar statute granting specific authority to boards of trade. They have, however, exercised such authority for the past thirty-five years with the consent of all interested parties, so that the custom or usage has become the subject of judicial notice. See 20 Am.Jur., Evidence, Secs. 109 and 110.

Various local boards of trade have developed successively different systems of apportioning selling time among warehouses. Examples of such systems are "wall-to-wall", or the sale of all available tobacco in each warehouse before proceeding to the next; the "unit" system, under which each warehouse is counted as one unit; "floor space", or the allocation of the total available selling time among the warehouses in proportion to their square foot area; and

the "performance" system, under which selling time is allocated to each warehouse on the basis of its individual last year's performance.

Up to the time of plaintiffs' advent upon the Douglas market, the operators of the six other warehouses had been able to reach unanimous agreement upon the amount of selling time to be allotted to each warehouse. Plaintiffs' appearance on the scene resulted in the adoption by the Board of Trade of the new by-law with which we are here concerned, and the effect of which, broadly speaking, was to switch from the "floor space" system to the "performance" system.

■ This case does not involve any plan of market price fixing either directly or indirectly. There is, therefore, no conclusive presumption of illegality.[5] The guiding principle in this case is that stated in Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683:

"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of in-

5. Compare United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700; Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; F. T. C. v. Beech-Nut Packing Co., 257 U.S. 441,

42 S.Ct. 150, 66 L.Ed. 307; United States v. Socony-Vacuum Oil Co., Inc., 310 U. S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236.

tent may help the court to interpret facts and to predict consequences."

See, also, United States v. Tarpon Springs Sponge Exchange, 5 Cir., 142 F.2d 125, 128.

■ The Sherman Act does not erect any standards for the positive conduct of trade and commerce, it is prohibitory legislation. Men may conduct their businesses as they see fit so long as they do not tend to restrain trade or commerce. As recently expressed by the Supreme Court:

"That there is a national policy favoring competition cannot be maintained today without careful qualification. It is only in a blunt, undiscriminating sense that we speak of competition as an ultimate good. Certainly, even in those areas of economic activity where the play of private forces has been subjected only to the negative prohibitions of the Sherman Law, [15 U.S.C.A. § 1 et seq.], this Court has not held that competition is an absolute. See *Chicago Board of Trade v. United States,* 246 U.S. 231 [38 S.Ct. 242, 62 L.Ed. 683]; cf. Mason, Monopoly in Law and Economics, 47 Yale L.J. 34.

"Prohibitory legislation like the Sherman Law, defining the area within which 'competition' may have full play, of course loses its effectiveness as the practical limitations increase; as such considerations severely limit the number of separate enterprises that can efficiently, or conveniently, exist, the need for careful qualification of the scope of competition becomes manifest. Surely it cannot be said in these situations that competition is of itself a national policy. To do so would disregard not only those areas of economic activity so long committed to Government monopoly as no longer to be thought open to competition, such as the post office, cf., e. g., 17 Stat. 292 (criminal offense to establish unauthorized post office; provision since superseded), and those areas, loose-

ly spoken of as natural monopolies or—more broadly—public utilities, in which active regulation has been found necessary to compensate for the inability of competition to provide adequate regulation. It would most strikingly disregard areas where policy has shifted from one of prohibiting restraints on competition to one of providing relief from the rigors of competition, as has been true of railroads. Compare, e. g., *United States v. Trans-Missouri Freight Assn,* 166 U.S. 290 [17 S.Ct. 540, 41 L.Ed. 1007] and *United States v. Joint Traffic Assn,* 171 U.S. 505 [19 S.Ct. 25, 43 L.Ed. 259] with the Transportation Act of 1920, 41 Stat. 456, 480 [49 U.S.C.A. § 4]; *Consolidation of Railroads,* 63 I.C.C. 455." Federal Communications Commission v. RCA Communications, Inc., 346 U.S. 86, 91, 92, 73 S.Ct. 998, 1003, 97 L.Ed. 1470.

■ We are led to the conclusion that the Douglas Tobacco Board of Trade did not violate the Sherman Act simply by exercising the regulatory powers, necessarily devolving upon it, of allocating selling time among the warehouses on the local market. As said by Mr. Justice Frankfurter concurring in Associated Press v. United States, 326 U.S. 1, 27, 65 S.Ct. 1416, 1428, 89 L.Ed. 2013:

" * * * ever since the Sherman Law was saved from stifling literalness by 'the rule of reason', *Standard Oil Co. [of New Jersey] v. United States,* 221 U.S. 1 [31 S. Ct. 502, 518, 55 L.Ed. 619]; *United States v. American Tobacco Co.,* 221 U.S. 106 [31 S.Ct. 632, 55 L.Ed. 663]; it is not sufficient to find a restraint. The decisive question is whether it is an unreasonable restraint. This depends, in essence, on the significance of the restraint in relation to a particular industry. Compare *Chicago Board of Trade v. United States,* 246 U.S. 231, 238 [38 S.Ct. 242, 244, 62 L.Ed. 683]."

So here, the real issues revolve about the legality and reasonableness of the

methods of allocating selling time. The legality of the "performance" method of allocating selling time has been sustained by the North Carolina Supreme Court and by the Federal Trade Commission.[6]

The opinion of the hearing examiner in the Matter of Wilson Tobacco Board of Trade, F.T.C.Docket No. 6262, contains a full and clear comparison of the various methods of allocating sales time from which he concludes that the performance system is best in that it transfers the area of competition from "butting dollar against dollar" in the construction of unneeded warehouse space to competition in the rendering of more and better service to the farmer.

The hearing examiner said:

"This system compels more intensive competition where it should be—on service, instead of bankroll—and puts the control of time share on the producer rather than on the financially powerful warehouseman. However, it brings problems with it also, such as equitable provision of time for a new entrant, who has no previous experience of 'performance' to serve as a base * * *." F.T.C.Docket No. 6262 at p. 22.[7]

The Commission, in its decision of August 23, 1956, approved that finding of the Hearing Examiner, saying in part:

"Weighing and judging the reasonableness of the performance system in the light of its intent and effect, and in the framework of realities of the market place, as estab-

lished on the record here, there remains no alternative but for us to conclude on the whole record that the initial decision is correct in upholding the reasonableness of the performance system." F.T.C.Docket No. 6262, p. 5.

As noted by the Hearing Examiner, however, a difficult problem is presented under the performance system to provide for a new entrant with no performance experience. In that case, the Board's regulation of December 5, 1952,

"provided that any newcomer on the Wilson market should be allotted for his ensuing first year of operation, the same amount of selling time as the last previous entrant (Liberty) had for that year, provided the new entrant built as large a warehouse as Liberty's; if not, then time is cut down in proportion to the size built." F.T.C. Docket No. 6262, p. 31.

The Hearing Examiner concluded that that regulation was an unreasonable restraint of trade, saying:

"It is, in the hearing examiner's opinion, inherently unreasonable and unfair to fix a man's opportunity to engage in competition on the basis of the ability and performance of only one of his competitors. A broader base, such as an average of all, for one year, or over a period, would be more reasonable and, of course, some account should be taken of the entrant's initial investment,

6. Day v. Asheville Tobacco Board of Trade, 242 N.C. 136, 87 S.E.2d 18. In the Matter of the Wilson Tobacco Board of Trade, F.T.C. Docket No. 6262; Initial Decision of Hearing Examiner In the Matter of Asheville Tobacco Board of Trade, Inc., F.T.C. Docket No. 6490. See, also, Cooperative Warehouse v. Lumberton Tobacco Board of Trade, 242 N.C. 123, 87 S.E.2d 25.

7. "In summary, then, the Hearing Examiner is of the opinion and therefore finds:
"1. That under the exigencies and unchangeable market conditions, generally, and at Wilson, North Carolina specifi-

cally, the performance system of allocating sales time is per se a reasonable regulation and therefore not illegal because,
"(a) it promotes rather than hinders competition among warehousemen by putting a premium on additional sales effort—solicitation, advertising, etc. and increases the area of that competition,
"(b) puts the competitive emphasis solely on the warehouseman's economic function—service,
"(c) penalizes laziness and other inefficiency in that service; * * *." F. T. C. Docket No. 6262, at p. 33.

in relation to that of others, already operating." F.T.C.Docket No. 6262, p. 32.

That part of the initial decision was not appealed, though the Commission in a footnote to its decision commented:

"The resolution in question established an allotment of selling time for newcomers on the Wilson market, the same amount as the last previous entrant (Liberty) had for that year provided the new entrant built a warehouse equally as large as Liberty with proportionate reduction of time if smaller. The hearing examiner found it to be unreasonable and unfair to fix opportunity to compete on the basis of the ability and performance of only one competitor, suggesting some other broader basis such as an average of all competitors on the market. Respondents have not appealed from that finding." F.T.C.Docket 6262, at p. 3.

The case of Day v. Asheville Tobacco Board of Trade, 242 N.C. 136, 87 S.E. 2d 18, involved a by-law strikingly similar to the by-law adopted by the Douglas Board of Trade. The selling time was allotted on the basis of the sales of the warehouses the previous year, with a provision that a new warehouse larger than average size would receive the same selling time as the average of the other warehouses. The Court said:

"And the rule by which the allotment was made to plaintiff by the Board appears fair and equitable. Indeed, it does not appear that there is any restraint of trade in the rule." 87 S.E.2d at page 24.

The allocation of selling time among the local warehouses, as has been shown, was a necessity. So long as they were in unanimous agreement there was no objection to the "Unit Floor-Space System." With the advent of a new and powerful competitor, no agency existed for the necessary allocation of time except the Douglas Board of Trade. The time within which it had to take action was brief. Construction of the new warehouse began in May. Various, albeit heated, discussions ensued. The warehouse was completed the last of June, and the new by-law adopted the 10th of July, five days before the opening of the 1954 season. The plaintiffs themselves, by the timing of their project, bear the primary responsibility for the extremely brief period of time within which action by the Board of Trade became necessary.

The most directly pertinent decisions then available by which the Board of Trade might chart its course were those which we have discussed. Under those decisions, we think that it was not unreasonable for the Board of Trade to conclude that the allotment to the newcomer of more than one-third of the total available selling time was inequitable, and instead to allot to it one-seventh of such time, leaving six-sevenths thereof for apportionment among the six other warehouses in accordance with their performances during the preceding year.[8]

Some doubt is cast upon that conclusion by the Initial Decision of the Hearing Examiner of March 29, 1957. In the matter of Asheville Tobacco Board of Trade, Inc., F.T.C.Docket No. 6490, in which he concluded that a similar new warehouse provision was in restraint of trade, saying:

"* * * it is basically unfair and arbitrary to limit the competitive opportunity of a new entrant in any market to the average competitive ability of all his established competitors. The very idea of such arbitrary limitation of opportunity is alien to the whole concept of the free-enterprise system." F.T.C. Docket 6490, p. 19.

█ In that decision, the Hearing Examiner declined to follow the precedent

8. There was already a surplus of warehouse floor space on the Douglas market and we think that the newcomer was entitled to no special consideration because of the unusual size of his warehouse.

of Day v. Asheville Tobacco Board of Trade, 242 N.C. 136, 87 S.E.2d 18, and erroneously stated that the Federal Trade Commission had approved the Hearing Examiner's finding that the regulation allocating selling time to new entrants adopted by the Wilson Tobacco Board of Trade was an unreasonable restraint of trade, when, as we have noted, there was no appeal from that part of the Initial Decision in F.T.C.Docket No. 6262. The Hearing Examiner in the Asheville case, supra, made no suggestion as to how the problem may be solved under the performance system to provide for a new entrant with no performance experience. Without some such solution, the merits of the performance system are largely nullified. We think the solution reached by the Douglas Board of Trade was substantially in accord with that approved by the North Carolina Supreme Court in Day v. Asheville Tobacco Board of Trade, supra, and with that suggested by the Hearing Examiner in the Wilson case, supra, and that it was not an unreasonable restraint of trade. Thus far, that is as to the year 1954, we are in agreement with the district court.

■ As to the year 1955, however, the case for the plaintiffs is stronger. We can see no justification for the limitation on increases and decreases in selling time to 3½ per cent, meaning, as construed and applied, not 3½ per cent of the total available selling time but 3½ per cent of the selling time allotted to the particular warehouse. Thus plaintiffs· 1954 allocation of 14.28 per cent was increased by less than one-half per cent (3½% of 14.28%) to 14.77 per cent. Whether a like limitation appearing in the by-law involved in Day v. Asheville Tobacco Board of Trade, supra, was construed and applied in the same manner we cannot know, for the opinion does not discuss this 3½ per cent limitation. No such limitation was involved in the Matter of Wilson Tobacco Board of Trade, F.T.C.Docket No.

6262, but a similar limitation was held to be in restraint of trade in the Initial Decision In the Matter of Asheville Tobacco Board of Trade, F.T.C.Docket No. 6490, the Hearing Examiner stating:

"Respondents adopted the gain-or-loss proviso, by which they assured themselves, not only that the established warehouses could not lose more than 3½% of their selling time in any one season by reason of business vicissitudes encountered during the preceding year, but that neither the new entrant nor any of the established warehouses could gain more than that amount in any one season. Again in the Wilson case, supra, the Hearing Examiner approved the performance system because he found that it possessed 'three requisites of competition: opportunities for competitors to grow; opportunities for competitors to appeal for patronage by improving or changing services; no restraint upon the farmer's freedom of election to patronize the competitor of his choice'. The gain-or-loss proviso obviously violates all these requisites of fair competition. In conjunction with the new-warehouse proviso, this limitation would have compelled the· new entrant to wait between three and four years, under optimum conditions, before receiving the just proportion of the available selling time, which, in a freely competitive system, would have been accorded to him promptly upon his entry into the market. This seems too heavy a competitive handicap for any business to be required to carry." F.T. C.Docket No. 6490, p. 19.

The 3½ per cent limitation, we think, practically froze the seven warehouses in their 1954 competitive positions, eliminated in major part the hope of gain and the risk of failure, inherent in a true performance system, and, if further evidence which may be taken upon remand shows that such limitation

tends to prejudice the public interest,[9] it may constitute an undue and unreasonable restraint of trade and commerce.

The question remains as to whether the action survived against the personal representatives of the estate of one of the defendants, R. E. Holcomb, who died on October 26, 1955, after the commencement of the action and after process had been served on him. The district court, while considering that the personal representatives had become parties to the cause, denied their motion and plea in abatement "in view of the order of this Court dismissing said cause as to all defendants."

■ Combinations in restraint of trade or tending to create or maintain a monopoly gave rise to causes of action at common law.[10] As we noted in Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 214 F.2d 891, 893, however, public injury alone justifies the threefold increase in damages.

■ The policy of the federal statute, we think, requires the survival of the cause of action to the extent that actual damages may be recovered.[11] Trebling of the damages seems to us to be in the nature of a penalty for the public wrong, and we do not think that the personal representatives would be liable for more than actual damages.[12] A different result would not be required even if the question were determined by the law of the State of Georgia.[13]

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

9. See Hudson Sales Corp. v. Waldrip, 5 Cir., 211 F.2d 268, 272; Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 214 F.2d 891, 894, and cases cited; Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236, 238.

10. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 25, et seq., 31 S.Ct. 502, 55 L.Ed. 619; 36 Am.Jur., Monopolies, Sec. 5; 58 C.J.S. Monopolies §§ 15 and 16.

11. Sullivan v. Associated Billposters & Distributors, 2 Cir., 6 F.2d 1000, 1012, 42 A.L.R. 503; Barnes Coal Corporation v. Retail Coal Merchants Ass'n, 4 Cir., 128 F.2d 645, 648; compare Cox v. Roth, 348 U.S. 207, 209, 210, 75 S.Ct. 242, 99 L. Ed. 260; see however, Sun Theatre Corp. v. R.K.O. Radio Pictures, 7 Cir., 213 F. 2d 284.

12. Haskell v. Perkins, D.C.N.J., 28 F.2d 222; compare Bowles v. Farmers National Bank of Lebanon, Ky., 6 Cir., 147 F.2d 425.

13. Code of Georgia Annotated:
"3–505: (4421) Action for tort not to abate by death of either party.—No action for a tort shall abate by death of either party, where the wrongdoer received any benefit from the tort complained of; nor shall any action, or cause of action, for the recovery of damages for homicide, injury to person, or injury to property abate by the death of either party; but such cause of action, in the case of the death of the plaintiff, shall, in the event there is no right of survivorship in any other person, survive to the personal representative of the deceased plaintiff; and in the case of the death of the defendant, shall survive against said defendant's personal representative. However, in the event of the death of the wrongdoer before suit shall have been brought against him, the personal representative of such wrongdoer in such capacity shall be subject to suit just as the wrongdoer himself would have been during his life; providing that there shall be no punitive damages. (Acts 1889, p. 73; 1935 pp. 94, 95; 1952 p. 224.)"