B. B. ROGERS et al., Appellants,

v.

DOUGLAS TOBACCO BOARD OF
TRADE, INC., et al., Appellees.

No. 17401.

United States Court of Appeals
Fifth Circuit.

May 5, 1959.

Charles J. Alexander, Norman M. Littell, Washington, D. C., John G. Kopp, J. Edwin Peavy, Waycross, Ga., for appellants.

E. Kontz Bennett, Waycross, Ga., Harold F. Baker, Washington, D. C., R. Glenn Key, Winston-Salem, N. C., Montgomery L. Preston, George E. Maddox, Douglas, Ga., for appellees, Bennett, Pedrick & Bennett, Waycross, Ga., Howrey & Simon, Washington, D. C., of counsel.

Before RIVES, JONES and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

This action is for treble damages for alleged violations of the Sherman Anti-Trust Act[1] in the allocation of selling time among the tobacco warehouses on the Douglas, Georgia, market. Most of the facts out of which this case arises, together with a description of the tobacco auction system, are set forth in our opinion on former appeal[2] and need not be repeated at length. The original complaint had involved only the 1954 and 1955 tobacco market seasons. The first

[1]. See 15 U.S.C.A. §§ 1, 2, and 15.

[2]. Rogers v. Douglas Board of Trade, Inc., 5 Cir., 1957, 244 F.2d 471.

appeal was from the judgment of the district court sustaining the motions of the defendants for judgment on the pleadings. As to the year 1954, the decisive question was whether the provision for the allocation of selling time to a new warehouse was an unreasonable, and hence illegal, restraint of trade. We agreed with the district court that it was not shown to be such. In the year 1955, the plaintiff was affected for the first time by a 3½ per cent limitation provision on increases and decreases in selling time as that limitation was construed and applied. We reversed as to the 1955 tobacco market season and remanded the cause for further proceedings, saying:

"The 3½ per cent limitation, we think, practically froze the seven warehouses in their 1954 competitive positions, eliminated in major part the hope of gain and the risk of failure inherent in a true performance system, and, if further evidence which may be taken upon remand shows that such limitation tends to prejudice the public interest,[9] it may constitute an undue and unreasonable restraint of trade and commerce.

"[9] See Hudson Sales Corp. v. Waldrip, 5 Cir., 211 F.2d 268, 272; Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 214 F.2d 891, 894, and cases cited; Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236, 238." Rogers v. Douglas Tobacco Board of Trade, Inc., 5 Cir., 244 F.2d 471, 482–483.

On remand a supplemental complaint was filed covering the 1956 and 1957 tobacco market seasons. After trial before a jury and verdict and judgment for the defendants, this appeal was taken.

On the first appeal, the question as to whether the tobacco auction sales on the Douglas Market were in interstate commerce was not argued by any of the parties, and we had assumed that they were. On remand, at the commencement of trial, the plaintiffs moved the district court to "declare, as a matter of law, that the auction sale of tobacco on the Douglas Market at Douglas, Georgia, is in interstate commerce." In response the court ruled: "That is a question of proof. I will leave that up to you as a question of proof." A considerable part of the evidence centered around that question. For example, the plaintiffs' first witness testified:

"A. Well, all of the tobacco, I believe, is eventually shipped into other states. I believe we have one concern which does some redrying on the Douglas Market, which happens to be the Douglas Tobacco Company which redries a small percentage of the tobacco there, but the most of it on the same day of sale, or the following day, is shipped by car or by truck to North Carolina or Virginia and some of it even goes into Kentucky to redrying plants and manufacturing and storage plants."

The facts thus testified were not controverted, but the defendants sought to prove that the 3½ per cent limitation did not affect interstate commerce by inferring that at the time of the local auction sale the interstate character had not been impressed on the commerce, for example:

"Q. Mr. Royster, what effect does the three and a half percent limitation on the warehousemen have on the flow of tobacco through the market and into interstate commerce? A. It doesn't have any effect on that at all.

"Q. Will you state why you make that statement? What are your reasons for making that statement? A. Well, going back to the testimony already given, there are a certain number of baskets allotted to each market and it doesn't affect interstate commerce, or the flow of tobacco whether it is sold in A house or B house, two houses or six houses. As soon as the sale is completed and the market has sold its allotment of tobacco, of course, the tobacco, as soon as possible, is moved out, and

from the Georgia area, there being only one redrying plant in Georgia and it a very small one it moves into principally North Carolina and to some extent into the State of Virginia for redrying and processing.

\* \* \* \* \* \*

"Q. Now, *Mr. Loftis,* what effect, if any, does this three and a half percent rule have on the flow of tobacco through the Douglas Tobacco Market? A. None that I can see.

"Q. Why do you make that statement? A. Because the Douglas Tobacco Market, as it has been shown, has allocated to it 4400 baskets per day, which it may sell, and the three and a half percent has no bearing whatsoever to the amount of tobacco allotted to the market.

\* \* \* \* \* \*

(On cross-examination)

"Q. *Mr. Loftis,* if one warehouse on the Douglas Tobacco Market was to get 4400 baskets of tobacco—concede that now, it is possible, is it not? (No answer.) Would that have any effect on Interstate Commerce as between those other warehouses there? A. If one warehouse was to get it all?

"Q. Yes, sir. A. And the others couldn't get it?

"Q. Yes, sir. A. The companies would buy every bit of it and ship it right out.

"Q. Would that affect commerce in any way? A. It might affect the individual, but I don't see where it would affect commerce because commerce would have it all in the trade."

In its charge to the jury, the district court repeated five times that, in order to recover, the plaintiffs must prove by a preponderance of the evidence four ultimate facts:

"First, that the three and one-half per cent limit affects interstate or foreign commerce;

"Second, that the three and one-half per cent limit prejudices or tends to prejudice the public interest;

"Three, that the three and one-half per cent limit constitutes an unreasonable restraint of trade; and

"Four, that the plaintiffs have suffered a private injury and been damaged as a direct result of the three and one-half per cent limitation."

The plaintiffs' counsel objected " \* \* to the continued mentioning of the four elements in the charge throughout as being prejudicial to the plaintiffs. It was a continued repetition, if Your Honor please, and it placed an undue burden on the plaintiffs." In response, the district court further instructed the jury:

"Now, gentlemen of the jury, I did not want to give undue emphasis to the four ultimate facts which I read to you. I read them to you two or three times, but I did not mean to give it any undue emphasis. I was just trying to explain the law to you as I see it, and don't give the charge as to those four ultimate facts any more emphasis than you do the balance of the charge."

After the jurors had deliberated for about two hours, they asked for additional instructions:

"The Court: Did you gentlemen want some additional instructions?

"A Juror: Yes, sir. We want a re-statement of those four points, the exact wording of those four points.

\* \* \* \* \* \*

"A Juror: We would like to write it down.

"The Court: All right, you can write it down, gentlemen. I charge you that in order to carry their burden of proof, the plaintiffs must prove four ultimate facts:

"(Note: The Court reads slowly while the jury writes down the instructions.)

"1. That the three and one-half per cent limit affects interstate or foreign commerce. That is No. 1.

"2. That the three and one-half per cent limit prejudices or tends to prejudice the public interest.

"3. That the three and one-half per cent limit constitutes an unreasonable restraint of trade.

"4. That plaintiffs have suffered a private injury and been damaged as a direct result of the three and one-half per cent limitation.

"Now, I charge you that if the public has been damaged it might be an unreasonable restraint of trade. That is a question of fact for you gentlemen to determine. Now, those four facts have to be proved. Not just three, but all four. Not one, not two, not three, but all four of them have to be proved by a preponderance of the testimony. Is that what you gentlemen wanted?

"The Jury: Yes, sir."

The jurors retired to deliberate further, but did not reach a verdict on that day. The following morning they again returned for additional instructions:

"The Court: Did you gentlemen want some additional instructions?

"The Jury: Your Honor, would you read or explain the Anti-trust Act, the part of the law that would affect interstate commerce?

"The Court: Do you want a definition of interstate commerce?

"The Jury: Yes, sir, or explain it to us.

"The Court: I will give you a definition of interstate commerce. This is from Black's Law Dictionary:

" 'Traffic, intercourse, commercial trading, or the transportation of persons or property between or among the several states of the Union, or from or between points in one state to points in another state. Commerce between two states is between places lying in different states.'

"Now, I will give you another definition in another book. This is 'Words and Phrases':

" 'Interstate Commerce: Commerce among the states cannot stop at the boundary line of each state but may be introduced into the interior. It is not intended to say that these words comprehend that commerce which is completely internal, which is carried on between man and man in the state or between different parts of the same state which does not extend to affect other states. Interstate Commerce or commerce among the several states is commerce that concerns more than one state.'

"The Court: Now, is that what you gentlemen wanted?

"The Jury: Read that first definition again.

"The Court: 'Traffic, intercourse, commercial trading, or the transportation of persons or property between or among the several states of the Union, or from or between points in one state to points in another state.'

"Now, is that what you gentlemen wanted, or is there anything else that I might be able to help you gentlemen on?

"The Jury: No, sir."

The plaintiffs' counsel then noted the following objection:

"We except to the Court's definition in defining Interstate Commerce in not instructing the jury that the auction sale of tobacco is interstate commerce. Citing as our authority the case of Curry vs. Wallace, Secretary of Agriculture, 301 United States. [sic]"

■ The applicable legal principles have been so long settled as to have become commonplace. For example, in Dahnke-Walker Milling Co. v. Bondurant, 1921, 257 U.S. 282, 290, 291, 42 S.

Ct. 106, 108, 66 L.Ed. 239, the Supreme Court said:

"The commerce clause of the Constitution, (article I, § 8, cl. 3), expressly commits to Congress and impliedly withholds from the several states the power to regulate commerce among the latter. Such commerce is not confined to transportation from one state to another, but comprehends all commercial intercourse between different states and all the component parts of that intercourse. Where goods in one state are transported into another for purposes of sale, the commerce does not end with the transportation, but embraces as well the sale of the goods after they reach their destination and while they are in the original packages. Brown v. State of Maryland, 12 Wheat. 419, 446–447, 6 L.Ed. 678; American Steel & Wire Co. v. Speed, 192 U.S. 500, 519, 24 S.Ct. 365, 48 L.Ed. 538. On the same principle, where goods are purchased in one state for transportation to another the commerce includes the purchase quite as much as it does the transportation. American Express Co. v. State of Iowa, 196 U.S. 133, 143, 25 S.Ct. 182, 49 L.Ed. 417. This has been recognized in many decisions construing the commerce clause."

Practically the same thoughts were repeated in Federal Trade Commission v. Pacific States Paper Trade Ass'n, 1927, 273 U.S. 52, 64, 47 S.Ct. 255, 71 L.Ed. 534.

Coming more specifically to the particular transactions involved in this case, the Tobacco Inspection Act of 1935, 7 U.S.C.A. § 511 et seq., and the decision of the Supreme Court upholding the constitutionality of that Act, Currin v. Wallace, 1939, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441, are pertinent. The first section of that Act provides:

"(i) 'Commerce' means commerce between any State, Territory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession, or the District of Columbia, but through any place outside thereof; or within any Territory or possession, or the District of Columbia. For the purposes of this chapter (but not in any wise limiting the foregoing definition) a transaction in respect to tobacco shall be considered to be in commerce if such tobacco is part of that current of commerce usual in the tobacco industry whereby tobacco or products manufactured therefrom are sent from one State with the expectation that they will end their transit, after purchase, in another, including, in addition to cases within the above general description, all cases where purchase or sale is either for shipment to another State or for manufacture within the State and the shipment outside the State of the products resulting from such manufacture. Tobacco normally in such current of commerce shall not be considered out of such current through resort being had to any means or device intended to remove transactions in respect thereto from the provisions of this chapter. For the purpose of this paragraph the word 'State' includes Territory, the District of Columbia, possession of the United States, and foreign nations." 7 U.S.C.A. § 511(i).

Subject to a referendum as to the desire of the tobacco growers affected, the Secretary of Agriculture "is authorized to designate those auction markets where tobacco bought and sold thereon at auction, or the products customarily manufactured therefrom, moves in commerce." 7 U.S.C.A. § 511d. The Douglas Market is such a "designated" market where the Department of Agriculture's Grading Service inspects, certifies the weight of, and grades tobacco sold at auction.

In Currin v. Wallace, 1939, 306 U.S. 1, 59 S.Ct. 379, 384, 83 L.Ed. 441, tobacco warehousemen and auctioneers in Oxford, North Carolina, attacked the

constitutionality of the Tobacco Inspection Act. Their counsel argued:

"The transaction of offering for sale tobacco at auction on warehouse floors is not a transaction in interstate commerce.

"After the tobacco has gone through the auction sale the farmer may, and often does, reject the offered price and take his tobacco away.

"The tobacco acquires interstate character only when the sale is consummated and possession passes from grower to purchaser. Tobacco, moving from the fields to the curing barns, and from the curing barns to the warehouse floors, is no part of interstate commerce. Observe that the inspection is required prior to the offering for sale. Control over commodities up to the point of sale is reserved to the States by the Tenth Amendment." Summary of argument by petitioners, 306 U.S. 3.

In response to that argument, Mr. Chief Justice Hughes speaking for the Court said:

"Plaintiffs urge that tobacco 'is not inherently an interstate commodity'; that the auction transaction is not a sale as title is not passed until the grower accepts the price; that after the auction the grower may, and often does, reject the bid and he may take his tobacco away; that the inspection required by the Act is done prior to the offering for sale; and that until sale and delivery to the purchaser the tobacco is not in interstate commerce and its control is reserved to the State. These objections are untenable. The record shows that the sales consummated on the Oxford auction market are predominantly sales in interstate and foreign commerce. The principal purchasers are few in number and in the main are engaged in the export trade or in the manufacture of tobacco products in other States. It appears that in a given week, shortly before the beginning of this suit, approximately 2,000,000 pounds of tobacco were sold on the Oxford market, only 15.3 per cent of which were definitely destined for manufacture in North Carolina. About 14 per cent were in part for manufacture in North Carolina and in part for other States, and about 62 per cent moved directly into foreign commerce. The fact that the growers are not bound to accept bids, and in certain instances reject them, does not remove the auction from its immediate relation to the sales that are consummated upon the offers that the growers do accept. The auction in such cases is manifestly a part of the transaction of sale. So far as the sales are for shipment to other States or to foreign countries it is idle to contend that they are not sales in interstate or foreign commerce and subject to congressional regulation. Where goods are purchased in one State for transportation to another the commerce includes the purchase quite as much as it does the transportation. Swift & Co. v. United States, 196 U.S. 375, 398, 399, 25 S.Ct. 276, 280, 49 L.Ed. 518; Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 290, 291, 42 S.Ct. 106, 108, 66 L.Ed. 239; Lemke v. Farmers' Grain Co., 258 U.S. 50, 54, 42 S.Ct. 244, 246, 66 L.Ed. 458; Stafford v. Wallace, 258 U.S. 495, 519, 42 S.Ct. 397, 408, 66 L.Ed. 735; Flanagan v. Federal Coal Co., 267 U.S. 222, 225, 45 S.Ct. 233, 69 L.Ed. 583; Shafer v. Farmers' Grain Co., 268 U.S. 189, 198, 45 S.Ct. 481, 484, 69 L.Ed. 909; Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 10, 49 S.Ct. 1, 3, 73 L.Ed. 147." Currin v. Wallace, supra, 306 U.S. 9, 10, 59 S.Ct. 384.

■ It is only because there has been so much apparent confusion over this issue in the district court that we have not disposed of it as briefly and suc-

cinctly as did the Fourth Circuit in the recent case of Asheville Tobacco Board of Trade, Inc. v. Federal Trade Commission, 4 Cir., 263 F.2d 502, 507:

"Petitioners further contend that the adoption of regulations governing 'the internal allocation of selling time' to the several warehouses is not in interstate commerce. The Commission has no jurisdiction to proscribe unfair methods of competition that merely *affect* interstate commerce; they must be *in* such commerce. F. T. C. v. Bunte Bros., 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881; cf. Chamber of Commerce of Minneapolis v. F. T. C., 8 Cir., 13 F.2d 673, 684. Tobacco auctions are an integral and indispensable part of interstate commerce in tobacco. Currin v. Wallace, 306 U.S. 1, 10, 59 S.Ct. 379, 83 L.Ed. 441, affirming Wallace v. Currin, 4 Cir., 95 F.2d 856, 859, 863. The practices of the Board and its members at issue in this case are an essential part of such commerce. American Federation of Tobacco Growers, Inc. v. Neal, 4 Cir., 183 F.2d 869."

■ The district court should have instructed the jury that auction sales of tobacco on the Douglas Market are a part of, in, and themselves constitute interstate commerce, and should not have left that question to plague and confuse the jury.

■ It is a question for the jury to decide as to whether the 3½ per cent limitation as construed and applied [3] constitutes an *unreasonable* restraint of trade or commerce within the meaning of the Sherman Anti-Trust Act. That is, of course, a mixed question of law and fact, but its resolution, under appropriate instructions, difficult as they may be, must ultimately be left to the jury. Fleitmann v. Welsbach Street Lighting Co., 1916, 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505; Thomsen v. Cayser, 1917,

243 U.S. 66, 88, 89, 37 S.Ct. 353, 61 L.Ed. 597; Ring v. Spina, 2 Cir., 1948, 166 F.2d 546, 550; Raytheon Mfg. Co. v. Radio Corporation of America, 1 Cir., 1935, 76 F.2d 943, 950, affirmed 296 U.S. 459, 56 S.Ct. 297, 80 L.Ed. 327. The strong language which we used on the former appeal in describing the effect of the 3½ per cent limitation, and which has been quoted near the beginning of this opinion, should not be construed as any indication of how the jury should decide that issue, nor permitted to influence the jury's verdict.

In Asheville Tobacco Board of Trade, Inc. v. Federal Trade Commission, supra, the Fourth Circuit sustained the Commission's condemnation of a similar 3½ per cent limit, but further observed:

" * * * There are, however, a number of reasons why it may be desirable that there be some limit on the possible gain or loss to an individual warehouse in a single year. Loss or damage to a warehouse by fire or other casualty, illness of the warehouseman, or other fortuitous circumstances, may cause an abnormal reduction in the business of a warehouse in a particular year, which should not be perpetuated by a performance rule without some limiting proviso. Again, a warehouseman with large financial resources might attempt to monopolize the market through advertising campaigns, bidding in farmers' tobacco at prices above those which his competitors can afford, and other methods, which could be used for several years until his selling time is abnormally increased, and his competitors of more limited means are driven from the market, even though they have rendered adequate service and have helped to build up the market over the years. A reasonable limitation on the percentage of gain or loss in any one year would not violate the antitrust laws."

---

3. There was testimony tending to prove that it was construed and applied even more restrictively than was indicated on former appeal. See 244 F.2d at page 482.

644

The testimony in the present case tends to sustain the Fourth Circuit's view that some limitation on the percentage of gain or loss in any one year is reasonable, and, we think, that question, together with the reasonableness of the particular 3½ per cent limit, as construed and applied by the defendants, must be left to the jury under proper instructions.

■■ In our opinion on former appeal, we said that the plaintiffs upon remand must produce evidence to show that the 3½ per cent limitation tends to prejudice the public interest. In the Sherman Act Congress has determined that certain prohibited activities are injurious to the public. Radovich v. National Football League, 1957, 352 U.S. 445, 453, 77 S.Ct. 390, 1 L.Ed.2d 456. As to classes of restraints which from their "nature or character" are unduly restrictive, Congress has determined its own criteria of public harm. Klor's, Inc. v. Broadway-Hale Stores, Inc., 79 S.Ct. 705, 709. In restraints, like the present one to which "the rule of reason" applies, while the jury should not, and cannot properly, reject the policy of the Sherman Act which has been determined by Congress, it must still decide whether the particular conduct is reasonably calculated to prejudice the public interest which that Act is designed to protect. Wilder Mfg. Co. v. Corn Products Refining Co., 1915, 236 U.S. 165, 174, 35 S.Ct. 398, 59 L.Ed. 520; Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311; Mandeville Island Farms v. American Crystal Sugar Co., 1948, 334 U.S. 219, 242, 243, 68 S. Ct. 996, 92 L.Ed. 1328. That does not mean that specific public injury must be proved before a private person can recover; but before it can be said that the conduct is forbidden as *unreasonably* restraining trade or commerce within the meaning of the Sherman Anti-Trust Act it must appear that it *tends* or is *reasonably calculated* to prejudice the public interest.

■ Upon the former appeal we upheld, under the circumstances there disclosed, the reasonableness and validity of the new warehouse provision intended to discourage overbuilding by limiting the amount of selling time which a new warehouse might receive for its first year, and we adhere to that decision. Our holding was, however, limited to the first year, 1954, and was not intended to prevent consideration of the new warehouse provision in determining whether the 3½ per cent limitation for the years 1955 and those following is an unreasonable restraint on trade. For example, that 3½ per cent limitation might be unreasonable if, combined with the new warehouse provision, it would operate to unduly discourage desirable building operations. See Asheville Tobacco Board of Trade, Inc., v. Federal Trade Commission, supra.

■ Number one [4] of the four so-called ultimate facts upon which the district court placed so much emphasis is either erroneous or misleading,[5] and should not be submitted to the jury, because, as a matter of law, the auction sales of tobacco are *in* interstate commerce. Number two [6] is not a separate ultimate fact, but is a part of the test of an unreasonable restraint of trade under number three.[7] On that and on number four,[8] the plaintiffs, upon a retrial, have the burden of proof.

The judgment is reversed and the cause remanded.

Reversed and remanded.

4. "That the three and one-half per cent limit affects interstate or foreign commerce."

5. It might be only misleading because "affects" might be construed to mean "burdens."

6. "That the three and one-half per cent limit prejudices or tends to prejudice the public interest."

7. "That the three and one-half per cent limit constitutes an unreasonable restraint of trade."

8. "That the plaintiffs have suffered a private injury and been damaged as a direct result of the three and one-half per cent limitation."