368 F.2d 927
 Joseph C. EAGLES, Jr., Ula H. Cozart, Jr., Sydnor M. Cozart, Fred M. Eagles, and Ula H. Cozart, III, co-partners trading under the name and style of Cozart, Eagles & Company, a partnership, Appellants,
v.
HARRISS SALES CORPORATION, a corporation, et al., Appellees.
 No. 10336.
 United States Court of Appeals Fourth Circuit.
 Argued May 5, 1966.
 Decided October 19, 1966.
 
 Francis E. Winslow, Rocky Mount, N. C. (Thomas L. Young, Rocky Mount, N. C., W. A. Lucas, Z. Hardy Rose, Wilson, N. C., and Howard E. Manning, Raleigh, N. C., and Battle, Winslow, Merrell, Scott & Wiley, Rocky Mount, N. C., Lucas, Rand, Rose & Morris, Wilson, N. C., and Manning, Fulton & Skinner, Raleigh, N. C., on brief), for appellants.
 Frederick L. Carr, Cyrus F. Lee and John Webb, Wilson, N. C. (Winfield Blackwell, Jr., Winston-Salem, N. C., Thomas M. Moore and Talmadge L. Narron, and Carr & Gibbons, Wilson, N. C., Blackwell, Blackwell, Canady & Eller, Winston-Salem, N. C., Kirby & Webb, Moore & Moore, Narron, Holdford & Holdford, and Gardner, Connor & Lee, Wilson, N. C., on brief), for appellees.
 Before SOBELOFF and BRYAN, Circuit Judges, and FIELD, District Judge.
 ALBERT V. BRYAN, Circuit Judge.
 
 
 1
 This is an antitrust action brought by Cozart, Eagles & Company, a partnership and a member of The Wilson Tobacco Board of Trade, Inc., against the Board itself and certain corporations (together with their officers and directors) and partnerships who comprise a voting majority within the Board. The complaint alleges a violation by the majority membership of the Sherman Act §§ 1 and 2, 15 U.S.C. §§ 1, 2, by conspiring to restrain and monopolize trade in the sale of leaf tobacco in the Wilson, North Carolina market to the injury of Cozart. Damages and injunctive relief were sought under the Clayton Act, §§ 4 and 16, 15 U.S.C. §§ 15, 26. Verdicts were directed for some defendants, and found by the jury for the remaining defendants. A judgment dismissing the action followed. Plaintiffs appeal.
 
 
 2
 We affirm. As the evidence was altogether inadequate to establish a conspiracy, a monopoly or an unreasonable restraint of trade, a verdict should have been directed for all of the defendants. That it was not, however, is inconsequential because the same result is found in the final judgment. The inadequacy of the evidence relied upon by the plaintiffs may be demonstrated by the following summary:
 
 
 3
 The Wilson Tobacco Board of Trade, Inc. is a non-stock membership corporation organized under § 106-465, General Statutes of North Carolina. Its members consist of tobacco warehousemen and purchasers of leaf tobacco at auction on the warehouse floors in the Wilson market, one of the largest for flue-cured tobacco in the nation. Membership in the Board is a prerequisite to participation in the sale, purchase or other dealing in leaf tobacco on the market.
 
 
 4
 The plaintiffs owned the Centre Brick warehouses, Nos. 1, 2 and 3. They also had a 70% interest in two Watson warehouses. The defendant corporations (other than the Board) and partnerships owned or controlled 13 warehouses, and were all members of the Board. Voting at the board meetings was by warehouses. As far as is pertinent to this case the warehouses, each enjoying one vote, were so distributed among the 10 owners that plaintiffs were entitled to 5 votes and defendants to 13.
 
 
 5
 The perishability of leaf tobacco makes it imperative that no more be put on the market in a day than can be offered for sale. Moreover, the number of buyers and their representatives is limited. For these reasons, tobacco growers, warehousemen and buyers have through regional associations and local trade boards fixed limits upon the hourly and daily amounts of tobacco that may be sold at auction. The necessity and mechanics of establishing these factors were clearly outlined in Danville Tobacco Assoc. v. Bryant-Buckner Associates, Inc., 333 F.2d 202 (4 Cir. 1964); Asheville Tobacco Board of Trade v. F.T.C., 263 F.2d 502 (4 Cir. 1959), reheard 294 F.2d 619 (1961); American Federation of Tobacco Growers v. Neal, 183 F.2d 869 (4 Cir. 1950); and Rogers v. Douglas Tobacco Board of Trade, Inc., 244 F.2d 471 (5 Cir. 1957), appeal after trial on remand 266 F.2d 636 (5 Cir. 1959), cert. den. 361 U.S. 833, 80 S.Ct. 85; 4 L.Ed.2d 75.
 
 
 6
 Aside from the difficulties of assuring new entrants reasonable access to a board-regulated market, an issue in the above cases but not present here, a fundamental and ever present problem is how to divide the total tobacco offerable on a day among the participating warehouses. The number of pounds or baskets of tobacco that a warehouse is permitted to sell before the buyers move on to another warehouse is known as its selling time. At Wilson the Board of Trade had the duty and function under its charter to allocate the selling time among the several warehouses. Wilson was a five-set market; that is it had 5 teams or sets of buyers. Each team was composed of a representative from each of the buying companies. Wilson's allotment was 10,000 baskets per day for a 5-hour day or 11,000 baskets for a 5½ hour day, to be sold at an hourly rate of not more than 400 baskets, to each of the five buying teams — an overall maximum of 2000 baskets per hour. A description of some of the more common modes of distributing selling time may be found in Rogers v. Douglas Tobacco Board of Trade, supra, 244 F.2d 471, 478.
 
 
 7
 Before 1940 the Wilson market operated on a wall-to-wall system, under which the warehouses drew lots to determine at which of them the sales should begin. Buyers commenced their purchases at the first warehouse so drawn and remained as long as there was tobacco to be sold. In 1940 the Board changed to the floor space system, which distributed the selling time among the warehouses in the ratio of the space in each to the aggregate warehouse area at Wilson. In 1952 the Board abolished the floor space scheme and adopted what is known as the performance system, which allocates selling time to each warehouse according to its previous year's performance. All of these changes were made by a unanimous vote in the Board.
 
 
 8
 In 1952 under the performance system Center Brick (the plaintiffs) held an allocation of 15.29% of the selling time. By the end of 1956 Centre Brick had increased its allotment to 24.80%. This was independent of the allotment of 9.52% given the Watson warehouses, which were controlled by the plaintiffs. On August 2, 1957 the performance system, with the consent of the plaintiffs, was revised, and Centre Brick for the 1957 season obtained an allotment of 20.24%.
 
 
 9
 The Board on July 21, 1958 by a vote of 10 to 7, with Centre Brick in the minority, resolved to rescind all regulations for the allocation of sales on the Wilson market. On February 19, 1959 the Board over the objection of Centre Brick and Watson adopted a modified unit system, effective in 1961.
 
 
 10
 In the interval — 1958, 1959 and 1960 — there was no fixed plan. Apportionment of selling time was made by a schedule whereby Centre Brick received and acquiesced in an allotment of 21% for 1958. The same allocation was made to Centre Brick for 1959 and 1960 by a unanimous vote in the Board. During these three years Centre Brick's percentages of the total market sales were 22.84%, 22.61% and 22.73% respectively.
 
 
 11
 By the modified unit system, adopted at the February 1959 meeting and effectuated in 1961, the selling time of Centre Brick was reduced to 16.02%. It meant, of course, an increase of selling time to the defendant Board members. The same allotment continued through 1962, 1963 and 1964.
 
 
 12
 This suit was brought in 1962 on allegations that the reduction occasioned by the adoption of the modified unit system was the result of a conspiracy by the defendant members to monopolize the trade on the Wilson market and constituted an unreasonable restraint of such trade, all to the damage of the plaintiffs. The complaint was amended thereafter to press the same claims for the years 1963 and 1964.
 
 
 13
 The plaintiffs concede that the modified unit system is "certainly reasonable as applied to a new market without our history", but they "contend that it was unreasonable to apply it to the plaintiffs" because there had been no change in market conditions to warrant a change in the method of issuing selling time. In this they argue that the Board exceeded its power under the North Carolina statute to make "reasonable rules and regulations for the economical and efficient handling of the sale of leaf tobacco at auction". G.S.N.C. § 106-465, supra.
 
 
 14
 The facts just recited are those to which the plaintiffs point as entitling them to prevail here under the Federal antitrust laws. We think they do not sustain their claim. Plaintiffs argue that the unreasonableness, the conspiracy, and the monopoly behind the application of the new regulation appear "as an ultimate fact" from "the foregoing evidentiary facts". But we must hold that this inference is not justified. Proof that a majority of the Board voted to reduce plaintiffs' selling time does not by itself establish any of these three factors. Something more is needed.
 
 
 15
 We grant that any such charge may be established by circumstantial evidence. To do so, however, demands evidence showing a higher degree of probability than is here proved. See Delaware Valley Marine Supply Co. v. American Tobacco Co., 297 F.2d 199, 202-203 (3 Cir. 1961), cert. den. 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962). "To hold to the contrary would be to allow speculation by the jury * * *." Id. at 205.
 
 
 16
 Assuming, as the plaintiffs assert, that the modified unit system is fundamentally a floor space system, the plaintiffs acknowledge that the square footage accorded Centre Brick was not an arbitrary figure. While the new assignment was only 16.02% as against 24.8% in 1956, the jury would not have been warranted in saying, and could not be allowed to say, on the evidence of the history of the market allotments, that this difference revealed an unreasonable restriction of the plaintiffs' trade. In 1952, as we have noted, Centre Brick's percentage was 15.29 and by 1956 it had grown to 24.8, with an additional 9.52 possessed by Watson. This augmentation was, of course, to the detriment of the defendant warehouses. Nevertheless, the plaintiffs accepted the advantage, and quite rightly it would seem, as the result of the normal operation of the market. In any event, it refutes plaintiffs' contention that a substantial difference in the annual selling time assignments evidences unreasonable regulation.
 
 
 17
 These variations on their face disclose no more than that the members were from time to time adjusting and read-justing the divisions of selling time to establish an equitable market participation. At least the plaintiffs do not prove otherwise.
 
 
 18
 The changes in the systems seem to have been similarly premised. They were adopted only after study by committees and upon apparently sound reasons. The wall-to-wall plan was found chaotic as the market activities outgrew its informality. The floor space plan was menaced by the threat of uneconomic enlargement of present structures or the entry of new ones in the market. Change to the performance system was approved by the Federal Trade Commission after investigation of a complaint, Docket 6262, against the Wilson Board of Trade. There is nothing to indicate that the utilization of the modified unit system was wrongfully conceived.
 
 
 19
 By becoming a member of the Board the plaintiffs, of course, consented to be bound by its reasonable regulations. Day v. Asheville Tobacco Board of Trade, 242 N.C. 136, 87 S.E.2d 18 (1955). Concededly, the very nature of leaf tobacco demands regulation of its sale, as the North Carolina statute recognizes and the decisions of the courts confirm. Asheville Tobacco Board of Trade, Inc. v. Federal Trade Commission, supra, 263 F.2d 502, 505, reheard 294 F.2d 619; Day v. Asheville Tobacco Board of Trade, 242 N.C. 136, 87 S.E.2d 18 (1955). Any such regulation, of course, constitutes some restraint upon each warehouseman, but the fact that the current allotment to plaintiffs is smaller than before does not prove it unreasonable under the Sherman Act.
 
 
 20
 "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. * * *"
 
 
 21
 Chicago Board of Trade v. United States, 246 U.S. 231 at 238, 38 S.Ct. 242 at 244, 62 L.Ed. 683, quoted in White Motor Co. v. United States, 372 U.S. 253, 261, 83 S.Ct. 696, 701, 9 L.Ed.2d 738 (1963). Plaintiffs have not met that test. See also Danville Tobacco Ass'n v. Bryant-Buckner Associates, Inc., 333 F.2d 202, 208 (4 Cir. 1964).
 
 
 22
 The very concept of a corporation to govern the market operations, as we have observed, presupposes that the members will associate and be controlled by a majority vote, so long as its resolves are not unreasonable. Hence, the mere joint action of a majority does not necessarily evince a conspiratorial motive. No other proof of conspiracy is attempted here.
 
 
 23
 Monopolization was alleged on the theory that the individual defendants, conspiring as a group possessing monopoly power, have exercised that power but have failed to justify it. But, as we have said, the evidence established no conspiracy and, thus, no group to possess the power. Nor can we characterize the corporation as a monopolist by reason of its control of the Wilson market. To make the Board justify its every regulation in court against antitrust accusations would be intolerable. Moreover, no attempted monopolization by individual defendants without the power was alleged, and, indeed, no evidence supports the specific intent that is an element of that offense.
 
 
 24
 As neither conspiracy, monopolization, nor unreasonableness were proved, no case was made by the plaintiffs under the Sherman Act. The plaintiffs assert that they resorted to suit as the only means of opposing an unreasonable regulation. They forewent their right to seek redress before the Federal Trade Commission. Asheville Tobacco Board of Trade, Inc. v. Federal Trade Commission, supra, 263 F.2d 502. As we have previously said, the Commission rather than the courts has the expertise, the power and the implements to explore and correct unfair trade regulations. Danville Tobacco Assoc. v. Bryant-Buckner Associates, Inc., supra, 333 F.2d 202, 209. This remedy was open to the plaintiffs; it would have been appropriate for the review of any grievances which the plaintiffs felt they were suffering.
 
 
 25
 The judgment on review will be affirmed.
 
 
 26
 Affirmed.